IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

STEPHEN TODD BOOKER,

      Petitioner,

v.                  CASE NO.:  1:08cv143/RS

WALTER A. MCNEIL,
      Secretary, Fla. Dept. of Corrections, et al.,

      Respondents.

_____/

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

THIS CAUSE is before the court on a petition for a writ of habeas corpus filed by Stephen Todd Booker, a Florida death row inmate, pursuant to Title 28, United States Code, Section 2254 (doc. 1). Petitioner has asserted five claims for relief. Respondents have filed an answer (doc. 19), and Petitioner has filed a reply (doc. 24). After careful consideration of the issues raised in the pleadings and for the reasons stated below, the petition is denied.

### I. FACTS & PROCEDURAL HISTORY

The relevant facts and lengthy procedural history are set out as follows in the Florida Supreme Court's opinion affirming Petitioner's sentence after a new penalty phase was conducted:

> On December 2, 1977, the State of Florida charged Booker with first-degree murder, sexual battery, and burglary, all stemming from the November 9, 1977, death of ninety-four-year-old Lorine Demoss Harmon. The facts established during the guilt phase of Booker's trial are set forth in *Booker v. State*, 397 So.2d 910, 912 (Fla.), cert. denied, 454 U.S. 957, 102 S. Ct. 493, 70 L. Ed.2d 261 (1981):

The victim, an elderly woman, was found dead in her apartment in Gainesville, Florida. The cause of death was loss of blood due to several knife wounds in the chest area. Two knives, apparently used in the homicide, were embedded in the body of the victim. A pathologist located semen and blood in the vaginal area of the victim and concluded that sexual intercourse had occurred prior to death. The apartment was found to be in a state of disarray; drawers were pulled out and their contents strewn about the apartment. Fingerprints of the defendant were positively identified as being consistent with latent fingerprints lifted from the scene of the homicide. The defendant had a pair of boots which had a print pattern similar to those seen by an officer at the scene of the homicide.

Test results indicated that body hairs found on the clothing of the defendant at the time of his arrest were consistent with hairs taken from the body of the victim.

After being given the appropriate warnings, the defendant made a statement, speaking as an alternative personality named "Aniel." The "Aniel" character made a statement that "Steve had done it."

On June 21, 1978, the jury returned a verdict finding Booker guilty of first-degree murder, sexual battery, and burglary, and the trial court adjudicated Booker guilty of those three offenses.

Booker's case then proceeded to a penalty phase hearing. During the hearing, the prosecutor told the jury that the only mitigating circumstances they could consider were those listed in Florida's death penalty statute, and the trial court's jury instruction regarding mitigating circumstances was equivalent to the instruction later found to be invalid by the U.S. Supreme Court in *Hitchcock v. Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed.2d 347 (1987). At the conclusion of the penalty phase hearing, the jury, by a majority vote of nine-to-three, recommended that Booker receive the death penalty. The trial court followed the jury's recommendation, sentencing Booker to death after finding three aggravating circumstances FN1 and no mitigating circumstances. Additionally, the trial court sentenced Booker to fifty-five years in prison on the sexual battery charge and thirty years

in prison on the burglary charge, with those sentences running consecutive to both each other and the sentence on the first-degree murder charge.

> FN1. The trial court found that (1) Booker previously had been convicted of a felony involving the use of threat of violence to another; (2) Booker committed the murder during the commission of a sexual battery and burglary; and (3) the murder committed by Booker was especially heinous, atrocious, or cruel.

This Court affirmed Booker's convictions and sentences on direct appeal, *see Booker*, 397 So.2d at 918, and the Supreme Court of the United States denied certiorari review of that decision. *See Booker v. Florida*, 454 U.S. 957, 102 S. Ct. 493, 70 L. Ed.2d 261 (1981). Subsequently, Booker initiated-or otherwise participated in-numerous proceedings in both state and federal court.FN2 Several of those proceedings are of particular relevance to the present proceedings. Specifically, in *Booker v. Dugger*, 520 So.2d 246, 247-49 (Fla.), cert. denied, 486 U.S. 1061, 108 S. Ct. 2834, 100 L. Ed.2d 935 (1988), this Court found that the trial court's penalty phase jury instruction regarding mitigating circumstances was erroneous in light of the U.S. Supreme Court's 1987 decision in *Hitchcock*, but a majority of this Court found that such error was harmless.FN3 The Eleventh Circuit later determined, however, that the *Hitchcock* error was not harmless, *see Booker v. Dugger*, 922 F.2d 633, 634 (11th. Cir.), cert. denied, 502 U.S. 900, 112 S. Ct. 277, 116 L. Ed.2d 228 (1991), and, as a result, Booker's case was remanded for resentencing. While awaiting resentencing, the U.S. Supreme Court decided *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed.2d 353 (1993), which, in essence, lessened the burden a state must meet to show that a constitutional violation did not prejudice a habeas petitioner's case. Based on *Brecht*, the State moved to vacate the relief previously granted to Booker, but the Eleventh Circuit rejected the State's arguments. *See Booker v. Singletary*, 90 F.3d 440, 442-44 (11th Cir.1996).

> FN2. & FN3. Omitted.

Booker returned for resentencing in 1997, and a new penalty phase hearing took place before a new jury in March 1998. During its

case-in-chief, the State introduced documentary evidence showing that (1) Booker was convicted of robbery in 1974; (2) Booker was out of prison on "Mandatory Conditional Release" when he murdered Mrs. Harmon (the victim); (3) Booker was convicted of first-degree murder, sexual assault, and burglary for the 1977 criminal episode involving the victim; and (4) Booker was convicted of an aggravated battery which occurred in 1980. Further, the State called four witnesses to testify regarding (1) the underlying facts of the 1980 aggravated battery committed by Booker while he was in prison; FN4 and (2) the facts surrounding Booker's first-degree murder, sexual assault, and burglary convictions.FN5 The defense then presented its case.

> FN4. Mr. Marvin Sylvester Thomas, Sr., a former guard at Florida State Prison, explained how Booker had burned him with a flammable substance while he was passing by Booker's prison cell, which was the crime for which Booker was convicted of aggravated battery.

> FN5. The State presented three witnesses to explain the facts underlying Booker's first-degree murder, sexual assault, and burglary convictions: Mr. Pete Fancher; Mr. David Smith; and Dr. Chantal Harrison. Mr. Fancher, a former officer with the Gainesville Police Department (G.P.D.), was the first officer to respond to the murder scene. Mr. Smith, also a former officer with G.P.D., was one of the crime scene investigators who responded to the murder scene. Finally, Dr. Harrison, a former associate medical examiner with Alachua County, performed the autopsy of the murder victim.

\* \* \* \*

At the conclusion of the penalty-phase hearing, the jury, by a majority vote of eight-to-four, recommended that Booker receive the death penalty. After conducting a subsequent hearing pursuant to *Spencer v. State*, 615 So.2d 688 (Fla.1993), the trial court followed the jury's recommendation and again sentenced Booker to death. In its sentencing order, the trial court denominated the aggravating and mitigating circumstances established in Booker's case. Specifically, the court found four aggravating circumstances: (1) Booker committed the capital felony while he was under sentence of imprisonment (great

weight); (2) Booker previously had been convicted of a violent felony (great weight); (3) Booker committed the capital felony while he was engaged in the commission of a sexual battery and burglary (great weight); and (4) the capital felony committed by Booker was especially heinous, atrocious, or cruel (HAC) (great weight). The court found two statutory mitigating circumstances: (1) Booker committed the capital felony while he was under the influence of extreme mental or emotional disturbances (great weight); and (2) Booker's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (substantial weight). Finally, the court found nine nonstatutory mitigating circumstances: (1) Booker was sexually abused as a child (substantial weight); (2) Booker was physically abused as a child (substantial weight); (3) Booker was verbally abused as a child (moderate weight); (4) Booker's family life was inconsistent (moderate weight); (5) Booker's education was interrupted repeatedly (slight weight); (6) Booker suffered from alcohol and drug abuse (moderate weight); (7) while in prison, Booker substantially improved his ability to be a productive citizen and to produce creative valuable contributions to American Literature (little weight); (8) Booker demonstrated his remorse and attempted to atone for his crime (little weight); and (9) Booker was honorably discharged from the United States Army (slight weight).FN10 After considering these factors, the trial court found that the aggravating circumstances substantially outweighed the mitigating circumstances, and thus sentenced Booker to death.

> FN9. The State did not present additional evidence during the *Spenc*er hearing, but the defense presented a videotaped statement by James E. Coleman, Jr., who previously had represented Booker in death warrant proceedings, as well as live statements made by Mrs. Zyromski and three other members of the murder victim's family, with the substance of all the statements being that Booker should receive a life sentence on his first-degree murder conviction.

> FN10. The trial court considered, but gave no weight to, the statements made by Mrs. Zyromski and other members of the victim's family, which urged that Booker be sentenced to life in prison.

***Booker v. State***, 773 So.2d 1079, 1081-83; 1086 (Fla. 2000)(per curiam)(*Booker I*), cert. denied, 532 U.S. 1033, 121 S. Ct. 1989, 149 L. Ed.2d 779 (2001). Petitioner appealed the death sentence he received after the new penalty phase proceeding, raising six claims for relief.[1] The Florida Supreme Court found no error and affirmed Petitioner's sentence of death. *See Booker I.* Petitioner thereafter filed a motion for postconviction relief under Fla. Rule of Criminal Procedure 3.851, raising numerous claims.[2] After an evidentiary hearing, the postconviction court denied relief, and the

---

[1]Petitioner asserted the following claims in the direct appeal of his death sentence after the new penalty phase: (1) the trial court erred in refusing to instruct the jury regarding the consecutive prison sentences he must serve based on his prior convictions for sexual battery, burglary, and aggravated battery; (2) the trial court clearly erred in determining that the State's reason for exercising a peremptory challenge on venireperson Phyllis Filer, a black woman, was genuine and not a discriminatory pretext; (3) the trial court erred in denying the defense's request to give a special jury instruction defining "mitigating circumstances;" (4) death is a disproportionate penalty in his case; (5) the trial court abused its discretion by prohibiting Mrs. Mary Page McKean Zyromski, a great-niece of the victim, from being present in the courtroom during the presentation of his case in mitigation until after she had testified on his behalf; and (6) to execute him after he has already spent over two decades on death row would constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States. *Booker v. State*, 773 So.2d 1079, 1086-87 (Fla. 2000)(per curiam)("*Booker I*").

[2]Petitioner asserted the following claims in his motion for postconviction relief: (1) counsel was ineffective because (a) two jurors who said they would not consider mitigating evidence remained on the jury simply because they were African-Americans (Petitioner later amended this claim to reflect that only one juror remained on the jury solely because of her race); (b) available factual evidence with regard to Petitioner's prior violent felony conviction was not presented, which would have demonstrated to the jurors that the charge actually constituted mitigation instead of aggravation; (c) no objection was made under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed.2d 177 (2004), to the reading of testimony from the first trial; to the reading of his 1974 and 1980 judgments to the jury; and to a witness's testimony "summing up" the evidence and the investigation; (d) witnesses who could have testified as to mitigation with regard to Petitioner's upbringing and his literary accomplishments were not presented; (e) no objection was voiced to the introduction of testimony with regard to Petitioner's unrelated collateral crimes; (f) no objection was made to the instruction to the jury that it should not consider the testimony of the victim's great niece, Page Zyromski, that she found his remorse to be sincere; (g) no objection was made to numerous improper statements by the prosecution during closing argument; and (h) Michael "Mick" Price, who was previously employed by the Gainesville Police Department, was not presented to rebut the testimony of Dr. Barnard with regard to the issue of malingering and Petitioner's honesty; (2) the State violated Petitioner's attorney-client privilege by improperly opening and reading his mail without disclosing this fact to his counsel; (3) Petitioner was denied his right to equal protection when the trial court did not instruct the jury on the length of time that he would be in jail if he received a life sentence; (4) Florida's sentencing scheme is unconstitutional under *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L .Ed.2d 556 (2002); (5) the presentation of hearsay during the resentencing trial violated the Confrontation Clause under *Crawford*; (6) Petitioner's twenty-seven-year incarceration on death row constitutes cruel and unusual punishment; (7) Petitioner has matured into an essential literary voice, and to execute him would implicate the freedom of the press and freedom of expression; and (8) an unsigned

Florida Supreme Court affirmed this denial. *See Booker v. State*, 969 So.2d 186 (Fla. 2007)(per curiam)(*Booker II*).

Petitioner filed the instant petition on February 20, 2008. Doc. 1. The petition is now ripe for adjudication.

## II. EVIDENTIARY HEARING

Petitioner requests a plenary evidentiary hearing on the claims presented in his petition.[3] Doc. 1 at 2. Title 28 of the United States Code, Section 2254 provides for an evidentiary hearing in federal habeas claims under very limited circumstances:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> > (A) the claim relies on--
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(2002). In *Schriro v. Landrigan*, 550 U.S. 465, 474-75, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007), the Court explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the

---

sentencing order in the State's files creates the prima facie presumption that the State improperly drafted the sentencing order or that the trial court did not conduct the proper weighing of the evidence. *Booker v. State*, 969 So.2d 186, 189-90 (Fla. 2007)(per curiam)("*Booker II*").

[3]Petitioner was granted an evidentiary hearing in state court.

Case No.: 1:08cv143/RS

applicant to federal habeas relief. *See, e.g., Mayes v. Gibson*, 210 F.3d 1284, 1287 (C.A.10 2000). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. *See id.*, at 1287-1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").

* * * *

This principle accords with AEDPA's acknowledged purpose of "reduc[ing] delays in the execution of state and federal criminal sentences." *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (citing *Williams v. Taylor, supra*, [529 U.S. 362] at 386, 120 S. Ct. 1495 (opinion of STEVENS, J.) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law")). If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.

(footnote omitted). Petitioner has not presented nor proffered any evidence to this court which would necessitate an evidentiary hearing on any of the claims he has raised. He has presented no factual allegations which, even taken as true, would entitle him to relief. *See Ojeda v. Sec.'y for Dep't. of Corr.*, 279 Fed. Appx. 953, 954 n.1 (11th Cir. 2008)(per curiam)(evidentiary hearing is unnecessary where trial transcripts sufficiently address an issue, and a hearing would not have added any new information*); Kelley v. Sec.'y for Dep't of Corr.*, 377 F.3d 1317, 1334-37 (11th Cir. 2004)(capital petitioner met none of the requirements contained in 28 U.S.C. § 2254(e)(2), thus district court abused discretion in granting evidentiary hearing); *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002)(under Section 2254(e) a hearing is not warranted "if such a hearing would not assist in the resolution of [the] claim." (citation omitted)). Because Petitioner has not met the requirements for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2), his request for an evidentiary hearing will be denied.

### III. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a

---

[4]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). The Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds* by *Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither

the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting *Williams*, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If, on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must proceed to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law may be found reasonable, and not warranting a writ, so long as the State court adjudication results in a "satisfactory conclusion." *Williams*, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum). When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 496 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); *Jones*, 496 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard,

habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U. S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[5]

Within this framework, the court will review Petitioner's claims.

## IV. PETITIONER'S CLAIMS

**Ground I:** **Trial Court Erred When Refusing to Instruct Jury About Other Consecutive Sentences**

Petitioner alleges that the trial court erred when it refused to inform the jury that he would have to serve one hundred (100) years in prison consecutive to whatever punishment they recommended to the court for the convictions he received for other related crimes he committed during the murder of Ms. Harmon and for a subsequent aggravated battery conviction against a corrections officer while he was incarcerated. Petitioner argues that the Florida Supreme Court unreasonably applied the applicable Supreme Court precedent, *i.e., Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed.2d 133 (1994), in its decision. Doc. 1 at 28-51.

### 1. State Court Proceedings

Petitioner raised this issue on direct appeal from his resentencing proceedings. The Florida Supreme Court denied relief, holding as follows:

> In *Nixon v. State*, 572 So.2d 1336, 1345 (Fla.1990), we held that a capital murder defendant, who had been convicted of three additional noncapital offenses carrying lengthy maximum penalties, was not entitled to an instruction informing the jury of the maximum sentences that could be imposed for the other crimes. *See also Franqui v. State*, 699 So.2d 1312, 1326 (Fla.1997) (following *Nixon*); *Marquard v. State*, 641 So.2d 54, 57-58 (Fla.1994) (same); *Gorby v. State*, 630 So.2d 544, 548 (Fla.1993) (stating that, according to *Nixon*, "during the penalty phase, there is no need to instruct the jury on the penalties for noncapital crimes a defendant has been convicted of"). Booker argues

---

[5]This harmless error standard is also applicable to cases involving habeas challenges to death sentences. *See Calderon v. Coleman*, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); *Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993); *Hicks v. Head*, 333 F.3d 1280 (11th Cir. 2003).

that *Nixon* is not controlling here because, unlike the defendant in that case, Booker has already been sentenced for the crimes other than the first-degree murder conviction. In making this argument, however, Booker overlooks several of our prior decisions applying *Nixon* to facts substantively identical to those in this case.

In *Campbell v. State*, 679 So.2d 720, 722 (Fla.1996), the defendant directly appealed a death sentence imposed on him after a resentencing hearing. After finding that the prosecutor had committed various acts of misconduct during the hearing, we reversed the defendant's sentence and again remanded for resentencing. *See id.* at 724-25. Before doing so, however, we addressed "several additional claims to aid in resentencing." *Id.* at 725. Particularly relevant to this case, we stated:

> At the time of resentencing, Campbell had already been sentenced to consecutive life terms for other related crimes and now claims that the court erred in preventing him from pointing this out to prospective jurors and in declining to instruct the jury on this. This issue has already been decided adversely to *Campbell. See, e.g., Nixon v. State*, 572 So.2d 1336 (Fla.1990), cert. denied, 502 U.S. 854, 112 S. Ct. 164, 116 L. Ed.2d 128 (1991). We find no error.

679 So.2d at 725. Thus, in *Campbell*, we clearly determined that *Nixon* is controlling in cases such as this.

More recently, in *Bates v. State*, 750 So.2d 6 (Fla.1999), we again applied our holding in *Nixon* to facts substantively identical to those presented here. In *Bates*, the defendant appealed from a death sentence imposed on resentencing for a murder that occurred in 1982. *See id.* at 8. Relevant to this case, we stated the following in rejecting Bates' claim that the jury should have been informed of his previously imposed sentences:

> [A]ppellant contends that the fact that he was already sentenced to two life terms plus fifteen years and that those sentences were to run consecutively to the sentence for the murder was relevant mitigation "in the sense that [it] might serve as a basis for a sentence less than death." We have rejected similar arguments in

*Franqui v. State*, 699 So.2d 1312, 1326 (Fla.1997); *Marquard v. State*, 641 So.2d 54 (Fla.1994); and *Nixon v. State*, 572 So.2d 1336 (Fla.1990).

These other sentences are not relevant mitigation on the issue of whether appellant will actually remain in prison for the length of those sentences. The length of actual prison time is affected by many factors other than the length of the sentence imposed by the sentencing court. The introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction.

*Bates*, 750 So.2d at 11. Accordingly, based on our prior decisions, we reject Booker's claim here on the merits.

*Booker I*, 773 So.2d at 1087-88.

2.      Clearly Established Supreme Court Law

In *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed.2d 133 (1994), the Supreme Court held that where a defendant's future dangerousness is at issue and state law prohibits his release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible.  Holding that Simmons was denied his right to defend the State's charge that he was a continuing danger to society, and finding that the instructions given by the trial court failed to satisfy that right, the Court concluded, "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id*., 512 U.S. at 171.

The Court expounded upon *Simmons* in *Shafer v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), in which it held that "whenever future dangerousness is at issue in a capital sentencing proceeding [in a sentencing scheme which provides only death or life without parole upon the finding of a statutory aggravating circumstance]. . . , due process requires that the jury be

informed that a life sentence carries no possibility of parole." Finally, in *Kelly v. South Carolina*, 534 U.S. 246, 122 S. Ct. 726, 151 L. Ed. 2d 670 (2002), the Court extended *Simmons* to cases in which future dangerousness is implied by the evidence and accentuated by the prosecutor even if it is not explicitly argued.

The Court has not, however, extended *Simmons* to cases where parole ineligibility has not been established as a matter of state law at the time of the jury's future dangerousness deliberations in a capital case. The Court has explained that "the dispositive fact in *Simmons* was that the defendant conclusively established his parole ineligibility under state law at the time of his trial." *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed.2d 125 (2000). In *Ramdass*, the defendant argued that pursuant to *Simmons*, the trial court should have instructed the jury that if convicted he would be ineligible for parole under Virginia's three-strikes law. The Virginia Supreme Court held that Ramdass was not parole ineligible at the time of the sentencing trial because no judgment of conviction had been entered for a previous crime which would have made Ramdass three-strikes eligible. The Court declined to extend *Simmons*, explaining:

> We do not agree that the extension of *Simmons* is either necessary or workable; and we are confident in saying that the Virginia Supreme Court was not unreasonable in refusing the requested extension.

> *Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison. Petitioner's proposed rule would require courts to evaluate the probability of future events in cases where a three-strikes law is the issue. Among other matters, a court will have to consider whether a trial court in an unrelated proceeding will grant postverdict relief, whether a conviction will be reversed on appeal, or whether the defendant will be prosecuted for fully investigated yet uncharged crimes. If the inquiry is to include whether a defendant will, at some point, be released from prison, even the age or health of a prisoner facing a long period of incarceration would seem relevant. The possibilities are many, the certainties few. If the *Simmons* rule is extended beyond when a defendant is, as a matter of state law, parole ineligible at the time of his trial, the State might well conclude that the

> jury would be distracted from the other vital issues in the case. The States are entitled to some latitude in this field, for the admissibility of evidence at capital sentencing was, and remains, an issue left to the States, subject of course to federal requirements, especially, as relevant here, those related to the admission of mitigating evidence. *Id.*, at 168, 114 S. Ct. 2187; *California v. Ramos*, 463 U.S. 992, 103 S. Ct. 3446, 77 L. Ed.2d 1171 (1983)."

*Ramdass*, 530 U.S. at 169.

### 3.    Federal Review of Claim

Petitioner contends that the jury was faced with a dilemma in recommending an advisory sentence to the court because it did not have accurate information about his eligibility for parole. Within minutes of the jury beginning its deliberations, the jury sent a question to the trial court. It stated, "[w]ill time already served be considered as gain time in a life sentence without possibility of parole for 25 years?" Trial Transcript ("T") Vol. XV at 2269. The trial court answered the question as follows: "[y]ou must not consider issues not presented to you for your consideration in these proceedings. You must base your advisory recommendation on the evidence presented to you in this proceeding and on the law on which you have been instructed by the Court." *Id.* at 2277. Petitioner opines that because the jury knew that he had spent twenty years in prison prior to his resentencing that it was concerned that he would be paroled in five years. Because of this fear, Petitioner believes that the jury recommended a death sentence to the court. Petitioner believes that had the jury known that he had consecutive sentences amounting to 100 years yet to serve, they would have recommended a life sentence.

While Petitioner's concerns are understandable, his argument is foreclosed by the fact that under state law at the time he was eligible for parole if he were sentenced to life in prison; therefore, *Simmons* is not applicable to his case. In *Simmons*, the Supreme Court held that the Constitution requires that States which offer a life-without-parole option in capital sentencing inform their juries of the defendant's future ineligibility for parole. The Court explained in *Simmons*:

In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole. States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like should be kept from the jury in order to provide "greater protection in [the States'] criminal justice system than the Federal Constitution requires." *California v. Ramos*, 463 U.S. 992, 1014, 103 S. Ct.3446, 3460 (1983). Concomitantly, nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release.

*Simmons*, 512 U.S. at 168.

While the majority opinion in *Booker I* did not address *Simmons* specifically,[6] the concerns quoted by the court in the opinion mirror those identified by the Supreme Court in *Simmons* and *Ramdass*, including that "'[t]he introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction.'" *Booker I*, 773 So.2d at 1088 (quoting *Bates v. State*, 750 So.2d 6, 11 (Fla. 1999)). *See Ramdass*, 530 U.S. at 169 ("even the age or health of a prisoner facing a long period of incarceration would seem relevant. The possibilities are many, the certainties few."). If accepted, Petitioner's argument that the jury should have been informed of his consecutive sentences could require countless considerations that would lead to additional uncertainty and complexity in capital sentencing proceedings. This approach is not clearly established by *Simmons, see* 28 U.S.C. § 2254(d)(1).

---

[6]In *Franqui v. State*, 699 So.2d 1312 (1997), the Florida Supreme Court held that *Simmons* does not control this type of claim.  The court noted, "[a]ppellant relies on *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed.2d 133 (1994), in which the United States Supreme Court held that 'where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible.' *Id*. at 156, 114 S. Ct. at 2190. However, *Simmons* is inapposite here since this case does not involve any direct effort to impose the death penalty based on the defendant's future dangerousness." *Id*. at 1326 n.10.

While the dissent argues that the majority opinion violates the spirit of *Simmons*, *see* Anstead, J., dissenting in part, *Booker I*, 773 So.2d at 1096-98, Petitioner has failed to demonstrate that the Florida Supreme Court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Additionally, while the Eleventh Circuit Court of Appeals has not addressed this specific argument, other circuit courts which have considered the extension of *Simmons* under similar facts have declined to do so. *See e.g., Cantu v. Quarterman*, 341 Fed.Appx. 55 (5th Cir. 2009)(denying petitioner's challenge that trial court preventing him from informing the jury that, based on Texas law at the time, he would be eligible for parole in thirty-five years were he sentenced to life in prison as opposed to death); *Campbell v. Polk*, 447 F.3d 270 (4th Cir. 2006)(denying claim and declining to adopt a "functional approach" for assessing parole ineligibility when due to petitioner's previous convictions he would not have been eligible for parole for eighty years). Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground II:    Petitioner's Sixth Amendment Rights Were Violated When His Mail Was Intercepted by Agents of the State Attorney's Office**

Petitioner alleges that the State surreptitiously intruded upon his trial preparations by instituting "mail cover" on his written correspondence passing through the prison when the State was preparing for his resentencing proceedings. Petitioner contends that  the Florida Supreme Court unreasonably applied the "*Weatherford*" standard, discussed *infra*, to the facts of his case. Doc. 1 at 52-65.

**1.    State Court Proceedings**

Petitioner raised this claim in his motion for postconviction relief. The Florida Supreme Court affirmed the postconviction court's denial of relief, holding as follows:

On September 16, 2005, the trial court held an evidentiary hearing on Claim II, in which Booker had alleged that the State had improperly interfered with his mail. During the evidentiary hearing, Assistant State Attorney Ralph Grabel testified that he was not aware of a "mail cover" being placed on Booker's correspondence,FN4 that he had never read Booker's mail, and that he was unaware of anyone else in the State Attorney's Office reading Booker's mail. Booker's counsel then presented to Grabel a memo from an investigator for the State (Michael "Mick" Price) FN5 addressed to Grabel and his co-prosecutor, Rod Smith, stating that an employee at Florida State Prison "asked whether or not we wanted mail cover on BOOKER. I declined the offer on the expectation that Johnny Kearns [Booker's attorney on resentencing] would eat us alive if he found out. If you believe otherwise, I'll simply call Ruise back and he'll handle it." Grabel was also shown other dated entries in the memo by Price referencing "mail cover." In one entry, Price wrote that "on 3-28-97, before leaving FSP, I picked up another collection of letters obtained under mail cover." In another, Price wrote:

> FN4. In the instant proceedings, the term "mail cover" appears to be used to describe a procedure in which the mail of inmates is monitored by prison staff.

> FN5. Prior to working for the State, Price was employed by the Gainesville Police Department.

On 4-10-97, while in the Starke areas hunting GASKINS, I drove past FSP and picked up another packet of mail cover. On 4-11-97, while reviewing the above mail cover, I ran across a letter written by BOOKER to Betty VOGH (a Gainesvillian who expects to be called as a witness) which informs VOGH of the "scuttlebutt" that the officers "... originators of the lies [Re: hand up dress incident] ... have received suspensions on an unrelated incident."

Grabel testified that prior to seeing the memo, he would have said that no discussion of "mail cover" had ever occurred. However, he conceded during the hearing that there was apparently a memo sent to him discussing, among other issues, "mail cover." Grabel verified that Price had been sent to the prison by then-State Attorney Smith to obtain information about other incidents of a disciplinary nature that could be used to rebut the defense's argument that Booker is now a

literary person and that his life was worth saving. However, Grabel reiterated that he has never utilized "mail cover" to gain a benefit for the State, and that he did not direct anyone to intercept any attorney-client privileged mail of Booker.

Rod Smith testified that while he was a state attorney, there were certain circumstances under which he would have authorized the use of "mail cover"; however, he did not request a mail cover on Booker's mail during the resentencing proceedings because it was not necessary. Smith verified that as lead counsel in the case, if "mail cover" were to be ordered, it would have been he (Smith) who would have authorized the procedure, and he did not. When Smith reviewed the memos from Mick Price, he conceded that it appeared that some form of "mail cover" of Booker's mail had occurred, but he reiterated that he did not authorize it, and if it had occurred, it was conducted without his authority. Smith also testified that the first time he had seen the memo from Price referencing the "mail cover" was the week of the evidentiary hearing. Smith asserted that, to his knowledge, the State Attorney's Office did not monitor Booker's mail, and he had never personally reviewed any mail that had been copied or taken from Booker.

The role of Mick Price in the Booker resentencing proceedings was to interview witnesses, and he did not recall any form of "mail cover" on Booker's mail. However, when Price reviewed the memo that he directed to Smith and Grabel, he conceded that it appeared that he had obtained some of Booker's prison mail. He stated that if he had been picking up "mail cover," he would have delivered it to the State Attorney's Office because he was working there at the time. However, he testified that the memo did not look familiar to him, and he had no recollection of reading Booker's mail. Further, on cross-examination, he testified that he did not recall having any conversations with Grabel or Smith with regard to "mail cover," he did not recall being asked to obtain "mail cover," and he did not recall bringing any mail back to the State Attorney's Office.

To rebut Booker's claims of tampering with legal mail, the State presented attorney Johnny Kearns, who represented Booker during resentencing. Attorney Kearns testified that his office was close to Florida State Prison, and either he or one of his investigators delivered all legal documents and mail to Booker by hand. Kearns stated that he would observe the prison officials check the legal documents for

contraband, and then they would hand the materials to Booker. Kearns stated that he only sent two letters to Booker through the mail-the first contained a money order for stamps, and the second addressed a court status conference and informed Booker that his case had been continued. Kearns testified that Booker had authored approximately fifty letters to him. Booker would write across the back of the envelope where it was sealed either the words "legal mail" or a series of X's across the seam. Kearns testified that it was his understanding that Booker was attempting to ensure that any tampering with his legal mail could be observed and identified. Kearns testified that he saw "no visible tampering or opening of the mail from the time they were sealed to the time that I received them." Kearns saw no signs of any tampering. Kearns further stated that at no time did he have concerns that the State had improperly obtained any information that was then used to subvert his strategy in representing Booker. Kearns testified that he would have objected to a State investigator obtaining privileged mail and reporting its contents to the prosecution. Kearns stated that he was not aware that Price had been picking up Booker's letters obtained under "mail cover." Upon reading the entry which discussed the letter from Booker to Betty Vogh, Kearns testified that if he had known about Price's actions, he would have inquired as to why the State was reading Booker's mail; however, he also recognized that the "letter from Mr. Booker to Ms. Vogh is not legal mail."

On November 22, 2005, the trial court entered an order denying Claim II. The trial court concluded that Booker had failed to present any evidence of tampering with his legal mail. The trial court concluded that Grabel and Smith were highly credible witnesses and accorded great weight to their testimony that they did not direct that Booker's mail be intercepted or opened and that they had not read any of Booker's mail. Although the trial court concluded that Mick Price was "quite a bit older and his memory ... was perhaps not as good as it used to be," it accepted his testimony that he did not tamper with Booker's legal mail. Finally, in reaching the determination that no tampering with legal mail occurred, the trial court relied on the testimony of Kearns, who "went out of his way to keep Mr. Booker from being concerned about mail tampering by hand delivering any communications."

Booker appeals the denial of his rule 3.851 motion.

The case upon which Booker relies to contend that the attorney-client privilege was violated when an agent of the State intercepted his mail

is *Weatherford v. Bursey*, 429 U.S. 545, 97 S. Ct. 837, 51 L. Ed.2d 30 (1977). In that case, *Weatherford* was an undercover agent for the South Carolina Law Enforcement Division. *See id.* at 547, 97 S. Ct. 837. Weatherford was "arrested" with defendant Bursey for vandalizing a selective service office. *See id.* While maintaining his cover, Weatherford, at the request of Bursey and his counsel, attended two meetings where they discussed the upcoming trial. *See id.* at 547-48, 97 S. Ct. 837. At Bursey's trial, Weatherford appeared as a witness and testified with regard to his undercover activities. *See id.* at 549, 97 S.Ct. 837. After his conviction, Bursey filed a claim for violation of constitutional rights under 42 U.S.C. § 1983 asserting that Weatherford had communicated defense strategies to his superiors and prosecuting officials which he had learned in meetings with Bursey and his attorney, which deprived Bursey of the effective assistance of counsel and his right to a fair trial. *See id.* The United States Supreme Court ultimately concluded that Bursey's section 1983 claim failed because Weatherford did not communicate any defense strategy to the prosecution and did not purposefully intrude on the meetings between Bursey and his counsel. *See id.* at 558, 97 S. Ct. 837. The Court further explained:

> [W]e need not agree with petitioners that whenever a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk and cannot complain if the third party turns out to be an informer for the government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial. Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise [Bursey's counsel]; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case.

*Id.* at 554, 97 S. Ct. 837.

As the above analysis demonstrates, the *Weatherford* case addressed actual attorney-client communications; it did not involve Bursey

speaking with or writing to a layperson. Further, the decisions which discuss the constitutional implications of intercepting inmate mail focus on legal mail rather than on correspondence with laypeople. *See generally Davis v. Goord*, 320 F.3d 346, 351 (2d Cir.2003) ("Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."); *Jensen v. Klecker*, 648 F.2d 1179, 1182 (8th Cir.1981) (rejecting claim that "the routine inspection of incoming and outgoing nonlegal mail constitutes a violation of [inmates'] civil rights"); *Thomsen v. Ross*, 368 F. Supp.2d 961, 973-74 (D.Minn.2005) ("A jailer who opens a prisoner's legal mail outside of the prisoner's presence may violate a prisoner's constitutional rights."). Booker does not present any case to support the proposition that if a government official or agent reads an inmate's nonlegal mail, the Sixth or Fourteenth Amendments become implicated. With this status of the law, we conclude that the key issue presented by this claim is whether the State interfered with Booker's legal mail, not whether the State (or its agent) ever accessed Booker's nonlegal mail.

In the order denying postconviction relief, the trial court made very specific findings with regard to whether tampering with Booker's legal mail had occurred:

> The Defendant has failed to present any evidence demonstrating the Defendant's legal mail was tampered with by any agent of the State. The Defendant, likewise, failed to present any evidence that privileged communications, in any form, were impermissibly intercepted, interfered with, or used by any agent of the State. Not only does the evidence not support the Defendant's claim his legal mail was tampered with or that the State knowingly interfered with his attorney-client relationship, there is a great deal of evidence to support it was not.

Following the denial of a postconviction claim where the trial court has conducted an evidentiary hearing, this Court affords deference to the trial court's factual findings. *See Walls v. State*, 926 So.2d 1156, 1165 (Fla.2006). If the trial court's findings are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact. *See id.* The same standard applies to the credibility of the witnesses as well as the weight to be

given to the evidence by the trial court. *See id.*

We conclude that the trial court's finding that neither the State nor its agent, Investigator Mick Price, tampered or interfered with Booker's legal mail is supported by competent, substantial evidence. Although the extensive facts developed during the evidentiary hearing reveal that some sort of "mail cover" may have occurred, and that Price may have retrieved mail from Florida State Prison, Booker has failed to identify a single piece of legal mail that was intercepted or touched by Price. Booker speculates that Price had collected some of Booker's mail, and, therefore, "all mail in and all mail out of FSP was compromised by the 'mail cover.' " However, Booker offers absolutely no substantive proof to support this conclusory statement. Further, even if we were to assume that Price did collect some of Booker's legal mail under the "mail cover," coprosecutors Rod Smith and Ralph Grabel denied ever having read any of Booker's mail, let alone his legal mail, and the trial court found their testimony to be credible. *Cf. Pietri v. State*, 885 So.2d 245, 272 (Fla.2004) (rejecting *Weatherford* claim where a document prepared by defense counsel's investigator was allegedly stolen and obtained by the State and noting that "[t]he state attorney maintained that he never read nor had access to the stolen document, and defense counsel did not challenge that assertion").

Further, the most compelling evidence that the State did not access Booker's legal mail was presented by Booker's resentencing counsel, Johnny Kearns. Kearns testified that he or one of his investigators had actually hand-delivered all but two pieces of correspondence to Booker, and the two pieces of mail that were sent to the prison did not contain any information with regard to the defense strategy. Moreover, Kearns testified that Booker took heightened precautions to ensure that his mail was not tampered with by writing either "legal mail" or a series of X's across the seal of the envelope, and Kearns saw "no visible tampering or opening of the mail from the time that they were sealed to the time that [he] received them." Kearns stated that had he suspected that the State was tampering with Booker's legal mail, he would have objected because he "would definitely have gotten concerned about" the interception of legal mail.

Competent, substantial evidence supports the trial court's conclusion that the State did not access, tamper with, or interfere with Booker's legal mail, and we affirm the trial court's denial of Booker's *Weatherford* claim. FN6

> **FN6.** Further, even if Booker had successfully established that the State had intruded into Booker's attorney-client relationship, he would not be entitled to relief under *Weatherford* unless he could show "prejudice in terms of injury to the defendant or benefit to the State." *Pietri,* 885 So.2d at 272 ("Because the state attorney had no access to the [allegedly stolen] document, *Pietri* has failed to demonstrate how he was prejudiced by the state attorney prosecuting the case."). Booker has failed to identify a single fact gleaned from the alleged "mail cover" that was used to Booker's disadvantage or to the State's advantage at trial.

*Booker II*, 969 So.2d at 190-94.

    2.       **Clearly Established Supreme Court Law**

In *Weatherford v. Bursey*, 429 U.S. 545, 97 S. Ct. 837, 51 L. Ed.2d 30 (1977), a convicted defendant brought a civil rights action against an undercover agent, alleging the agent's actions had denied him effective assistance of counsel at his criminal trial. In *Weatherford*, the police arrested both the undercover agent and the defendant for vandalizing a selective service office. *Id* at 547. At the defendant's request, the agent attended two pretrial meetings with the defendant and his lawyer to discuss the defendant's defense. *Id.* at 547-48. The agent did not initiate the meetings and did not seek information from the defendant or his attorney. *Id.* at 548. The agent did not disclose to his superiors any information derived from the meetings, and when the agent was unexpectedly called as a prosecution witness at trial, he did not testify about anything he learned at the meetings. *Id.* at 548-49.

On appeal the Fourth Circuit Court of Appeals held that " 'whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship, the right to counsel is sufficiently endangered to require reversal and a new trial.' " *Id.* at 549 (quoting *Bursey v. Weatherford*, 528 F.2d 483, 486 (4th Cir.1975)). The court of appeals held the agent was a member of the prosecution and it was immaterial that he had not informed other law enforcement officials about what was said at the meetings. *Id.* at 549-50. The court of appeals also held the

defendant was denied due process by the concealment of the agent's identity. *Id.* at 550.

The Supreme Court rejected the per se rule for reversal of a conviction in those circumstances. The Court also rejected the State's argument that a defendant assumes the risk whenever the defendant converses with counsel in the presence of a third party who is thought to be a confederate and ally. *Id.* at 554. Under the circumstances of the case, the Court said the defendant would have had a much stronger case for reversal if the agent had testified at trial about the conversations during the attorney-client meetings; if the State's evidence had originated from those conversations; if the conversations had been used in any way to the substantial detriment of the defendant; or if the prosecution had learned the details about the defendant's trial preparation. *Id.* at 554. The Court concluded, in the absence of any of those factors or a purposeful intrusion by the agent, there was no Sixth Amendment violation. *Id.* at 558-59.

### 3.    Federal Review of Claim

During the evidentiary hearing, Rodney Smith, lead state's attorney in Petitioner's resentencing proceeding, testified that to his knowledge no "mail cover" or mail monitoring was done regarding Petitioner's mail and he had "no recollection of using any mail that was taken or copied from Mr. Booker." Postconviction Record ("PCR") Vol. I at 40. When shown a memorandum to the state attorney's file written by Mick Price, an investigator with the state attorney's office[7], Mr. Smith testified that he did not believe he had seen the memo before. He stated, "I do not believe that I would have forgotten something that had to do with mail cover. I believe I would have remembered it, because it was something that I did not, it would have been a decision I would not take lightly to do something like that." *Id.* at 43. He clarified that the memo could have been in the state attorney's file, but "I'm telling you I didn't

---

[7] The Florida Supreme Court quoted the relevant portions of this memorandum in its opinion quoted *supra*.

see it, and I do not believe anybody would have the authority to do mail cover other than me in any case, and that is not something I did in this case." *Id*. at 44.

Ralph Grabel, assistant state attorney who was co-counsel in the case, was asked by the court to describe his understanding of the term "mail cover." He testified as follows:

> My basic understanding is that there is mail that comes in and out of the prison system. I believe all mail coming in and out of the prison system is checked to ensure there's no contraband or weapons. But anything that's marked legal mail would not be opened and read. Other things, I don't know if they're read. But I think what cover, mail cover is, is a review of all mail coming in and out to a particular inmate, specific, at the specific request of a party to do that, rather than the routine procedure.

*Id*. at 12. Mr. Grabel testified that he had never used mail cover in a case or spoken directly to anyone who had ever used it. *Id*. at 11.

Mr. Grabel was shown a memorandum from Mr. Price, dated November 19, 1996, and testified that he had first seen the memo a couple of days before the evidentiary hearing. *Id*. at 15-16. When asked if mail cover of Petitioner's mail was done by anyone working for the state, Mr. Grabel answered, "[i]t was not undertaken on my authority or to my knowledge by anyone else from the state attorney's office." *Id*. at 17-18. He continued, "I can tell you and the court that Mick Price never asked me directly if I wanted mail cover. I never ordered mail cover. I never spoke with Rod Smith about mail cover. I never saw any mail from Stephen Todd Booker. And I never was aware that anyone else connected with the resentencing saw or used any mail received under mail cover from Stephen Todd Booker." *Id*. at 18-19.

On cross-examination, Mr. Grabel testified that he never directed anyone to intercept attorney/client privileged mail from Petitioner, nor did he receive or read any such privileged communications. To the best of Mr. Grabel's knowledge, Mick Price was sent to Florida State Prison in order to gather information to rebut any evidence that Petitioner's adaptability to prison warranted a life sentence. *Id*. at 61.

Mick Price testified that he did not read Petitioner's mail nor had he ever used

mail cover. *Id*. at 76 & 78. When asked about his 4/11/97 memo in which he refers to reviewing mail cover, Mr. Price testified that the memo appears to suggest that he was reviewing the mail cover, but he stated, "I don't recall anything like that. . . ." *Id*. at 84. He did indicate that it was possible he was doing so as part of his investigation and if he had been reading Petitioner's mail, it would have been done for the state attorney's office. *Id*.

On cross-examination, Mr. Price was questioned by Mr. Grabel, and the following exchange occurred:

> Q: Do you have any recollection of Rod Smith or myself or anyone else connected with the Stephen Booker resentencing asking you to do mail cover?
>
> A: I have no recollection of it, no, sir.
>
> Q: Do you have any recollection of bringing mail back to the state attorney's office?
>
> A: No, sir, I'm afraid not.
>
> Q: Do you have recollection of any discussions with Rod Smith, myself, or anyone else connected with the resentencing regarding Stephen Todd Booker mail cover or the contents thereof?
>
> A: No, sir.
>
> Q: Mr. Brody asked you if you assumed that you must have been doing the mail cover at the direction, as part of your investigation. Again, did anyone from the state attorney's office ask you to do that?
>
> A: I was never asked to do that, that I recall.

*Id*. at 85-86. When asked what he was referring to when he references mail cover in a 4/11/97 memo, Mr. Price testified that he had "no idea." *Id*. at 88.

John Kearns, chief assistant public defender who was Petitioner's counsel at his resentencing proceeding, testified about his general policy regarding sending legal mail to his clients:

Mr. Booker is obviously not the first person I have corresponded with in the state prison system. I have a procedure that I follow. And probably the easiest way for me to answer this, because of the fact that Gainesville is so close to Florida State Prison and to UCI, it is my policy, if I am going to present documents to a client in either of those two facilities that I am representing, I will either personally give them the documents or I will send one of my investigators to personally give them the documents.

It would be a rare instance that I would send any materials to any inmate who I was currently representing to the state prison. After a case is over, certainly, and things have been litigated for appellate purposes and for post-conviction purposes, then I would be more than willing to send materials up to the prison. But while I'm actively involved, while the case is open, I will send, I will bring those materials either myself or through an investigator and personally deliver them to them.

*Id*. at 112-13. Mr. Kearns explained that when he says personally deliver, he means that he gives the documents to a sergeant who goes through it to make sure there is no contraband in Mr. Kearns' presence and then they would hand the documents to his client. Mr. Kearns testified that he employed this procedure in Petitioner' case and stated:

I went back to check the mail. I could only find two letters that I actually sent to Stephen Todd Booker. In the first letter I sent him a money order for stamps. I believe it was probably around Christmastime. The second letter was a couple of paragraphs that dealt with a status conference and that the case had been continued. Those were the only two letters I could find that I sent to him.

Mr. Booker, during the course of my representation, probably authored, I would say, approximately 50, possibly even more, letters to me while I was representing him. In reviewing some of these letters, and I skimmed most of them–

Objection and ruling omitted.

And in the course of those letters, there was mention of the fact that Max Short, he refers to him as Max, or Mack rather, had delivered materials to him that had come from me. So once again, that would

**corroborate the letters that I had used Mack Short, who is an investigator with the public defender's office stationed out of the Bradford County office. . . .**

*Id*. at 113-14.    When asked by Mr. Grabel about the letters he received from Petitioner, the following exchange occurred:

> **[Kearns]: As I stated before, I received approximately 50 letters from Mr. Booker. They were handwritten. The letters would come to me with my name. In the left-hand corner would be Stephen Todd Booker's correctional office, correction address. On the back where the envelope is sealed, it would be written across the seal, either legal mail or there would be a series of Xs written across. It's my understanding that that was done by Mr. Booker to try to ensure the fact that the mail would not be opened, so that if there was any tampering, it could be observed. I examined the letters again. I'm not saying it's impossible to open a letter, but I saw no visible tampering or opening of the mail from the time that they were sealed to the time that I received them. Once again, it is possible? I'm sure it is, but I saw nothing, like I said.**
>
> **[Grabel]: But you were reviewing those in the context of Mr. Booker's concern that in fact his legal mail may be–**
>
> **A: It is–**
>
> **Q:–opened?**
>
> **A: –my assumption the reason he wrote on the seal the way they were written on was to ensure the fact that the letters would not be opened inappropriately. I'm not familiar with the procedures at the correctional facility for the opening of mail, but I know he wrote legal mail on them.**
>
> **Q: And they appeared not to have been tampered with once he wrote legal mail on them?**
>
> **A: I could see no visible tampering of the letters.**

*Id*. at 115-16.  Mr. Kearns testified that he did not at any time have a concern that the State improperly obtained information from the defense or intercepted privileged mail and used its contents for the benefit of the State or to the detriment of Petitioner.  *Id*. at 119.  On cross-examination, Mr. Kearns testified that he had no

knowledge than Mr. Price may have been picking up Petitioner's mail and would have been concerned if he thought that any legal mail was being read. *Id*. at 121.

The postconviction court noted in its order denying postconviction relief that it found Mr. Grabel, Mr. Smith and Mr. Kearns credible. Specifically, the court stated Mr. Grabel "is well known to this Court and enjoys an excellent reputation in the local legal community," and Mr. Smith "has great credibility among members of the bar." Final Order, PCR Vol. I at 154. Finally, at the conclusion of the evidentiary hearing the court noted "I also accept Mr. Kearns [testimony], whose credibility in this community is also is extremely high. I think everyone would say that if Johnny Kearns tells you something, it goes to the bank." *Id*. at 139.

The Florida Supreme Court analyzed this claim under *Weatherford* and determined that that case dealt with actual attorney-client communications, not the defendant's communications with a layperson. *See Bookier II*, 969 So.2d at 193. Further, the state court noted that the decisions which discuss the constitutional implications of intercepting inmate mail focus on an inmate's legal mail, not nonlegal mail. Because Petitioner failed to identify any case supporting a Sixth Amendment violation when a government agent reads an inmate's nonlegal mail, the court addressed the claim in terms of whether the State interfered with his legal mail. It concluded that the postconviction court's determination that neither the State nor its agent Mr. Price interfered with Petitioner's legal mail was supported by competent, substantial evidence. *Id*. at 194.

The state court found that Petitioner failed to identify a single piece of legal mail that was intercepted by Mr. Price. The state court found Mr. Kearns's testimony regarding the issue to be the most compelling evidence that Petitioner's legal mail was not accessed by the state. Finally, the state court found that Petitioner had demonstrated no prejudice because he did not identify any evidence gleaned from the mail cover used against him at trial. *Id*. at 194.

The Florida Supreme Court's rejection of this claim is amply supported by the

record. Petitioner has presented no competent evidence that his legal mail was intercepted by the State nor has he demonstrated that the State used any evidence it may have obtained through a possible mail cover of nonlegal mail to his detriment. *See U.S. v. Cross*, 928 F.2d 1030, 1053 (11th Cir. 1991)(government's improper acquisition of defense strategy is fatal to a conviction only where there was "a realistic possibility of injury to [the defendant] or benefit to the State." *United States v. Franklin*, 598 F.2d 954, 956 (5th Cir. 1979)(quoting *Weatherford,* 429 U.S. at 558)). Therefore, he has failed to demonstrate that his Sixth Amendment right to counsel was violated.

The state court's factual findings are supported by the record and must be given deference by this court, with particular deference being paid to the credibility determinations made by the postconviction court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground III:    Postconviction Court Erred in Denying Evidentiary Hearing on Several Claims in Violation of Petitioner's Due Process Rights**

**A.    Ineffective Assistance of Counsel in Failing to Call Witnesses to Challenge Prior Violent Felony Aggravator**

Petitioner alleges that his trial counsel should have called available witnesses to describe the events surrounding his 1981 aggravated battery conviction on correctional officer, Marvin Thomas (which he describes as the "fire bomb" incident), as well as other conditions and incidents impacting this conviction that occurred while Petitioner was on death row. He alleges that had the jury known the

true facts surrounding this conviction, the evidence would have operated to mitigate against the imposition of the death penalty. Doc. 1 at 67-69.

1.  State Court Proceedings

The postconviction court denied this claim as insufficiently pled. The Florida Supreme Court affirmed this denial and addressed this claim as follows:

*I. The Prior Violent Felony Aggravator.* Booker contends that the trial court erred in summarily denying his claim that counsel was ineffective for failing to present evidence regarding the inapplicability of the prior violent felony aggravator in this case. In 1980, Booker committed an aggravated battery when he threw a flaming substance at a former Florida State Prison guard and burned him. Booker contends that had the trial court ordered an evidentiary hearing on this claim, Booker would have presented witnesses who would have described the context in which this "fire-bomb" incident occurred. Booker asserts that if counsel had presented this testimony to the jury, it would have viewed Booker's actions in a more sympathetic context and would have viewed his conviction for aggravated battery as evidence in mitigation rather than aggravation.

To establish a claim of ineffective assistance of trial counsel for failing to call certain witnesses, a defendant must allege in the motion "what testimony defense counsel could have elicited from [the] witnesses and how defense counsel's failure to call, interview, or present the witnesses who would have so testified prejudiced the case." *Nelson v. State*, 875 So.2d 579, 583 (Fla.2004).FN8 If the claim is insufficiently pled, a defendant should be given leave to amend his claim; however, if the claim is not amended, then the denial may be with prejudice. *See* 875 So.2d at 583-84.

> FN8. Although *Nelson* was a noncapital case that involved Florida Rule of Criminal Procedure 3.850, we have applied the pleading requirements enunciated in *Nelson* to rule 3.851 motions to vacate. *See Bryant v. State*, 901 So.2d 810, 821-22 (Fla.2005).

In his initial motion, Booker failed to allege the names of the witnesses he would have presented to testify with regard to the alleged "fire-bomb" incident which resulted in his conviction for aggravated battery. In accordance with *Nelson*, the trial court provided Booker with

an opportunity to amend this claim. In his amendment, Booker proceeded to name himself, inmate Gary Trawick, and inmate William White as witnesses who might testify as to the alleged threats that the guard had made against Booker in the context of a "guard riot" that occurred after an inmate had fatally stabbed a prison guard. Booker also named attorney Susan Cary, a death row liaison from the Palm Beach County public defender's office, who would have testified that litigation may have stemmed from the guards' post-stabbing conduct.

We conclude that the trial court properly denied this claim without an evidentiary hearing because this claim as amended was still insufficiently pled. In the amended motion, Booker made equivocal statements about the substance of the witnesses' testimony. For example, Booker stated that "inmates Trawick and White *might* have testified to the threats which the guard, Mr. Thomas, made against Mr. Booker." (Emphasis supplied.) With regard to attorney Cary, Booker stated that Cary "believes that there *may* have been litigation stemming from the guards' post-stabbing conduct which the Department of Corrections *may* have settled." (Emphasis supplied.) Thus, while not totally speculative, there is clearly a lack of specificity as to the substance of the testimony that these witnesses would have offered. *Cf. Bryant v. State*, 901 So.2d 810, 821-22 (Fla.2005) (concluding that a 3.851 claim of ineffective assistance was legally insufficient where the substance of the testimony was not described in the motion and the motion did not allege the specific facts to which the witness would testify). Further, Booker failed to allege such pivotal facts as what first-hand knowledge attorney Cary possessed with regard to the "fire-bomb" incident and whether inmates Trawick and White had actually witnessed prison guard Thomas threaten Booker. With these omissions, we conclude that Booker's amended claim failed to comply with the pleading requirements announced in *Nelson*. Therefore, we affirm the trial court's summary denial of this claim.

Moreover, even if this claim had been sufficiently pled, we conclude that Booker still would not have been entitled to relief. The record of the resentencing proceedings demonstrates that the State initially sought to present multiple witnesses to expand upon the "fire-bomb" incident, including an expansion upon possible motives involved in the incident. Counsel for Booker objected to this expansion, contending that the additional testimony would cause the prior violent felony to become a feature of the trial. The trial court agreed, concluded that the prejudice of this type of testimony would outweigh any probative value, and

**sustained the objection. The trial court further sustained objections to the presentation of testimony with regard to the medical treatment that the guard received for his burns and the length of time that he was hospitalized for the injuries. The trial court only allowed testimony with regard to the incident itself.**

**Thus, the trial court precluded the introduction of evidence with regard to matters prior to the attack or after the attack and when the guard was transported to the hospital. Given the strict parameters established by the trial court with regard to the admission of evidence of the "fire-bomb" incident, we conclude that, had counsel for Booker attempted to introduce expanded testimony that attempted to address broad circumstances and motives under which the incident may have occurred, it similarly would have been precluded by the trial court. Therefore, we conclude that trial counsel was not ineffective for failing to offer witnesses to present this testimony. *See generally Marquard v. State,* 850 So.2d 417, 431 (Fla.2002) ("Trial counsel cannot be faulted for failing to hire and call a witness whose testimony would not be relevant or admissible....").**

*Booker II*, 969 So.2d at 195-97.

B.      **Ineffective Assistance of Counsel in Failing to Investigate and Present Mitigation**

Petitioner alleges that his counsel was ineffective in failing to call a variety of available witnesses who would have testified regarding his early life.  He also alleges that his counsel failed to present the full extent of his accomplishment as "an influential figure on the national and international literary 'scene'" by failing to call more witnesses and failing to adequately prepare those witnesses who did testify as to this mitigation.  Petitioner contends that, but for the ineffectiveness of his counsel, these witnesses would have provided greater evidence in mitigation. Doc. 1 at 70-72.

1.      State Court Proceedings

The postconviction court denied this claim as insufficiently pled. The Florida Supreme Court affirmed this denial and addressed this claim as follows:

*II. Counsel's Failure to Investigate and Present Mitigation.* **Under this claim, Booker alleged that his counsel was ineffective for failing to offer**

evidence of the full scope of Booker's accomplishments as an influential figure on the literary scene. According to Booker, his counsel failed to educate himself on the topic of poetry. As a result, counsel could not effectively respond to the State's assertion that a poet should not be treated differently than anyone else. Booker contended that, had counsel been better prepared, he could have shown that sparing Booker's life has precedence in literature.

As with the prior issue, when Booker initially raised this claim in his 3.851 motion, he did not name the witnesses that defense counsel should have called, and he failed to outline the specific substance of their testimony. Rather, Booker made general statements such as the following:

> Counsel failed to present available evidence of the full scope and extent of Mr. Booker's accomplishment as an influential figure on the national and international literary "scene." Numerous witnesses could have been called to explain to the jury Mr. Booker's accomplishment in this regard, as could exhibits of Mr. Booker's work, which would have explained the person in a unique and powerful fashion.

As with the prior violent felony claim, the trial court provided Booker with an opportunity to amend his motion with respect to this issue. In his amendment, Booker named six witnesses, stating that they would educate the jury on the literary tradition into which Booker's work fits and more accurately educate the jury on his contributions to the rich vein of American and international letters into which his works feed and from which he has derived his themes. He also asserted that three additional witnesses who were experts on the poet Ezra Pound could have been called "to show why and how [Pound] had been freed from a death sentence." In denying this claim, the trial court stated during the *Huff* hearing:

> I've already indicated that the weight to be given to this particular mitigating circumstance is extremely slight. The fact that one has learned a skill, whether it's poetry or cabinet-building or whatever it may be, the practice of law, is not a reason not to impose the death penalty.
>
> If Shakespeare committed this crime, regrettably, I think

we would be missing a lot of enjoyable plays. You're not excused from following the law because, especially after the fact, you become adept at some skill.

In the order summarily denying this claim, the trial court elaborated:

During the penalty phase, trial counsel presented more than ample evidence of Defendant's literary accomplishments while on death row. This Court placed little weight on this evidence. Any alleged failure to present additional and cumulative testimony would have not resulted in a life sentence.

As with the prior issue, we conclude that the instant claim was insufficiently pled under *Nelson*. Booker failed to specify what the precise testimony of each of these witnesses would have been, how their testimony would have differed from the six poetry experts who testified during Booker's resentencing, or how counsel was deficient in selecting those six experts who did testify.

Moreover, even if this claim had been sufficient, Booker cannot demonstrate that his counsel was ineffective. Following the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

*Maxwell v. Wainwright*, 490 So.2d 927, 932 (Fla.1986) (citations omitted). During the resentencing proceedings, trial counsel called the following six witnesses to testify with regard to Booker's literary

accomplishments while he has been incarcerated:

> (1) Professor Deborah Tall, professor of English at Hobart and William Smith College, as well as editor of Seneca Review; (2) Ms. Suzann Tamminen, Editor-In-Chief at Wesleyan University Press; (3) Professor Hayden Carruth, Professor Emeritus at Syracuse University (by video); (4) Professor Stuart Lavin, writer and professor at Castleton State College; (5) Professor Stuart Friebert, poet and professor at Oberlin College; and (6) Professor Williard Spiegleman, professor of English at Southern Methodist University.

*Booker*, 773 So.2d at 1085 n. 8.

Professor Tall testified that Booker is "a remarkably original writer and very, very skilled in his use of language," that he "has tremendous insight into character, into his own and others," and that "he writes like no one else. I mean, very very valuable poems." She also testified that Booker's book "Tug" earned the endorsement of the first African-American to win the Pulitzer Prize, Gwendolyn Brooks. Professor Hayden Carruth made the following statements via videotape with regard to Booker as a poet:

> I don't think of anyone else whom I would compare with him. I can't think of other people who had done work similar to his, in somewhat similar situations, particularly in recent years. Black writers who have also been in prison, people like Ethridge Knight (phonetic). But also black writers who have not been in prison.
>
> ....
>
> People are interested in him. He is doing work that is on the one hand significantly connected to the work of his colleagues, black writers, and on the other hand, new and different and original. (Inaudible). In that sense I think he is comparable to a good many poets.

When asked what Booker's place is in the literary community, Carruth responded: "He's a person of consequence, he's a person of great intelligence and perception." Professor Lavin testified that Booker's

style was "visionary" and that Booker "transmutes ... language. He actually transforms it. So when you read his work, it evokes something beyond just what the words themselves say." Professor Friebert testified with regard to Booker's involvement in translating the work of "arguably Albania's most important poet" into English. Professor Friebert also read one of Booker's poems, titled "Prospectus," to the jury. Finally, on cross-examination, Friebert verified that poet Ezra Pound was prosecuted as a traitor, but was later pardoned due to the intercession of individuals who admired his work.

Trial counsel is not deficient for failing to present cumulative evidence. *See Duckett v. State*, 918 So.2d 224, 237 (Fla.2005), cert. denied, 549 U.S. 846, 127 S. Ct. 103, 166 L. Ed.2d 78 (2006). Given the extensive testimony with regard to Booker's accomplishments and value as a poet, had defense counsel called the nine witnesses listed in Booker's amendment, their testimony would merely have been cumulative to that of the six individuals who testified during the resentencing proceeding. Moreover, Booker cannot demonstrate that he was prejudiced by counsel's failure to present cumulative evidence, especially in light of the fact that the trial court noted in its denial order that (1) it gave little weight to this mitigator in its sentencing order, and (2) "[a]ny alleged failure to present additional or cumulative testimony would not have resulted in a life sentence." *See also Maxwell*, 490 So.2d at 932 ("It is highly doubtful that more complete knowledge of appellant's childhood circumstances, mental and emotional problems, school and prison records, etc., would have influenced the jury to recommend or the judge to impose a sentence of life imprisonment rather than death."). Therefore, we affirm the trial court's summary denial of this claim.

*Booker II*, 969 So.2d at 197-99.

### C. Ineffective Assistance of Counsel in Failing to Object to Prosecutorial Misconduct

Petitioner alleges his counsel was ineffective in not objecting to various improper remarks made by the State in its closing argument. Doc. 1 at 73-75.

### 1. State Court Proceedings

The Florida Supreme Court held that Petitioner had abandoned this issue and addressed the claim as follows:

When a defendant fails to pursue an issue during proceedings before the trial court, and then attempts to present that issue on appeal, this

Court deems the claim to have been abandoned or waived. *See Mungin v. State*, 932 So.2d 986, 995 (Fla.2006). We conclude that Booker has abandoned the following claims: (1) counsel was ineffective for failing to object to the trial court instructing the jury not to consider witness Page Zyromski's testimony; (2) counsel was ineffective for failing to call Mick Price to rebut Dr. Barnard's testimony regarding possible malingering by Booker; (3) counsel was ineffective for failing to object to testimony regarding the introduction of nonstatutory aggravators that involved Booker's unrelated collateral crimes; and (4) counsel was ineffective for failing to object to prosecutorial statements during closing argument. The record reflects that although Booker attempted to raise these claims in his initial postconviction motion, they were insufficiently pled. Additionally, during the first *Huff* hearing, Booker did not raise or argue these issues, nor did he request permission to amend the portions of Claim I that addressed these issues.FN7 Moreover, Booker failed to reassert these claims in his amendment to Claim I. We conclude that Booker completely failed to pursue these claims in the proceedings before the trial court, and, therefore, they have been abandoned.

> FN7. Instead, Booker specifically requested leave to amend only Claims 1(a) (the juror challenge), 1(b) (the circumstances surrounding Booker's prior felony aggravator), and 1(d) (the failure to present available mitigation).

*Booker II*, 969 So.2d at 194-95.

D.    Allegation Regarding *Simmons* Claim

Petitioner alleges that the trial court should have granted an evidentiary hearing on his claim under *Simmons v. South Carolina*, *supra*, that his jury should have been instructed about the time he would remain in jail if given a life sentence. He also made an equal protection argument based on his assertion that another capital defendant was given an instruction regarding the amount of time he would remain in prison during his penalty phase trial.  Doc. 1 at 76-77.

1.    State Court Proceedings

The postconviction court summarily denied this claim, and the Florida Supreme Court affirmed holding as follows:

*III. Jury Instruction*. **Booker next claims that the trial court erred in summarily denying his claim that the failure to give an instruction to the jury regarding the amount of time that Booker was facing in prison if he received a life sentence violates equal protection. This claim is procedurally barred because claims that address the adequacy or constitutionality of jury instructions must be raised on direct appeal.** *See Rodriguez v. State*, **919 So.2d 1252, 1280 (Fla.2005). Indeed, on direct appeal, Booker asserted that "the trial court erred by refusing to inform the jury regarding the consecutive sentences Booker received for his prior burglary, sexual battery, and aggravated assault convictions."** *Booker*, **773 So.2d at 1087. This Court denied Booker's claim on the merits, noting that "[t]he introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction."** *Id.* **at 1088 (quoting** *Bates v. State*, **750 So.2d 6, 11 (Fla.1999)). Thus, Booker already has challenged the propriety of this jury instruction, and he is procedurally barred from raising subsequent challenges in the instant proceeding.** *See Thompson v. State*, **759 So.2d 650, 665 (Fla.2000) (stating that substantive challenges to jury instructions are procedurally barred in postconviction proceedings because the claims could and should be raised on direct appeal). The trial court properly denied this claim without holding an evidentiary hearing.**

*Booker II*, 969 So.2d at 199-200.

E.     Allegation Regarding Cruel and Unusual Punishment

Petitioner alleges the postconviction court erred in denying an evidentiary hearing on his claim that his incarceration on death row for almost thirty years constitutes cruel and unusual punishment. He alleges that he would have presented evidence as to the State's unreasonable legal delays which have needlessly protracted his stay on death row. Doc. 1 at 77-78.

1.     State Court Proceedings

The postconviction court summarily denied this claim. The Florida Supreme Court affirmed, holding as follows:

*V. Length of Incarceration*. **Booker contends that the trial court erred in summarily denying his claim that his incarceration for almost thirty years on death row constitutes cruel and unusual punishment. We**

> conclude that the trial court properly denied this claim without an evidentiary hearing. Booker has already asserted on direct appeal that "to execute him after he has already spent over two decades on death row would constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States." *Booker*, 773 So.2d at 1096. In rejecting this claim, we noted that no federal or state court has accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay. *See id.* Additionally, in *Lucas v. State*, 841 So.2d 380 (Fla.2003), this Court affirmed the trial court's summary denial of a claim that the defendant's extended stay on death row constituted cruel and unusual punishment. *See id.* at 389 ("Despite his length of stay, under this Court's clear precedent, the trial court did not err in refusing to grant him an evidentiary hearing on his claim of cruel and unusual punishment."). We similarly affirm the trial court's summary denial of this claim.

*Booker II*, 969 So.2d at 200.

F.     Allegation Regarding Newly Discovered Evidence

Lastly, Petitioner alleges that the postconviction court erred in denying an evidentiary hearing on newly discovered evidence that would establish that executing him at this time "would serve no legitimate penological purpose and that an execution infringes upon the public's continuing First Amendment interest in reading [his] work." Doc. 1 at 78-79.

1.     State Court Proceedings

The postconviction court summarily denied this claim. The Florida Supreme Court affirmed, holding as follows:

> *VI. Newly Discovered Evidence.* In his final claim, Booker asserts that the trial court erred in summarily denying his claim that newly discovered evidence has emerged which demonstrates that to execute him at this time would serve no legitimate penological purpose and would infringe upon the First Amendment right of the public to continue reading his work. In this claim, Booker contends that his literary talent has continued to mature, and that numerous editors would testify to the value of preserving his unique and important voice. According to Booker, the American public has acquired an interest in his work, such that the public's interest in vengeance is outweighed by its interest in benefiting from Booker's literary voice. Booker asserts that because of

the great benefits to society that he can offer, his life should be spared.

We conclude that the trial court properly denied this claim without an evidentiary hearing. Booker has cited no decision, Florida or otherwise, for the proposition that a death row inmate's literary accomplishments constitute newly discovered evidence that mandates vacation of a death sentence. Booker similarly provides no legal support for his First Amendment claim. Therefore, we affirm the summary denial of this claim.

*Booker II*, 969 at 200-01.

### 2. Clearly Established Supreme Court Law

Federal habeas corpus relief is available only to correct constitutional injury. 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a). Such relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80, 116 L. Ed.2d 385 (1991) (holding errors that do not infringe upon a defendant's constitutional rights provide no basis for federal habeas corpus relief). Federal habeas review of a state law claim is, therefore, precluded if no due process violations or facts indicating such violations are alleged. *Wainwright v. Goode*, 464 U.S. 78, 104 S. Ct. 378, 78 L. Ed.2d 187 (1983); *see also Barclay v. Florida*, 463 U.S. 939, 958-659, 103 S. Ct. 3418, 3429, 77 L. Ed.2d 1134 (1983) ("Mere errors of state law are not the concern of this court ... unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution.") (citations omitted); *Engle v. Isaac*, 456 U.S. 107, 102 S. Ct. 2976, 73 L. Ed.2d 1361 (1981).

It is well-established in the Eleventh Circuit that a prisoner's challenge to the process afforded him in a state postconviction proceeding does not provide a basis for habeas corpus relief. *See Carroll v. Sec'y for Dep't of Corr.*, 574 F.3d 1354, 1365 (11th Cir. 2009), cert. denied, 130 S. Ct. 500, 175 L. Ed.2d 355 (2009)(holding that habeas petitioner's claim, that the state court violated his due process rights when it summarily denied his postconviction claim without an evidentiary hearing, did not state a claim on which a federal court may grant habeas relief); *see also Anderson*

*v. Sec'y for Dep't of Corr.*, 462 F.3d 1319, 1330 (11th Cir.2006) (per curiam); *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir.2004); and *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir.1987) (per curiam)(holding that habeas petitioner's claim that errors in Rule 3.850 proceeding violated his right to due process did not state a basis for habeas relief because the claim "[went] to issues unrelated to the cause of petitioner's detention.").

The Eleventh Circuit explained in *Carroll* that "[t]he reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment-- *i.e.*, the conviction itself--and thus habeas relief is not an appropriate remedy." *Carroll*, 574 F.3d at 1365.   Moreover, such challenges often involve claims under state law, for example Fla. R. Crim. P. Rule 3.850, and "'[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.'" *Id.* (quoting  *McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir.1992)). Therefore, the Eleventh Circuit determined because of this bar to relief that it is "beyond debate" that a state court's failure to conduct an evidentiary hearing on a postconviction motion does not constitute a cognizable claim for habeas relief.  *Id.*

3.    Federal Review of Claim

Because Petitioner's Fourteenth Amendment challenge in all of the subclaims in Ground III involves the process afforded him in a proceeding collateral to his confinement, *i.e.*, the failure to grant an evidentiary hearing on the issues presented, and not the confinement itself, he does not state a claim on which this court may grant habeas relief.

Additionally with regard to subclaim C, Respondents assert a procedural bar to habeas review because Petitioner failed to present this claim in state court. Respondents also assert a procedural bar to habeas review with respect subclaim D because the Florida Supreme Court asserted a procedural bar to the issue.  It is a

long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. §2254(b)(1),[8] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78. An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999).

This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S. Ct. 2546, 2555, 115 L. Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by

---

[8]Section 2254 provides, in pertinent part:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
    (B) (i)  there is an absence of available State corrective process; or
      (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed.2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  *Bailey*, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L.Ed.2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S. Ct. 850, 858, 112 L. Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

Based on the foregoing, subclaims C and D are procedurally barred from habeas review.  Additionally, this ground is denied because Petitioner has failed to raise a claim upon which habeas relief can be granted.

**Ground IV:  Trial Court Erred in Finding State Had a Race-Neutral Reason for Exercising Peremptory Challenge on Prospective Juror**

Petitioner alleges that the State used one of its peremptory challenges to exclude a prospective juror, Ms. Phillis Filer, on the basis of her race.  Petitioner contends that another prospective juror, Mr. William Pepper, should have raised similar concerns for the State, but he, a white man, was not excluded.   Petitioner contends that the trial court erred in determining the State's reason for the challenge

was race-neutral.  Doc. 1 at 80-84.[9]

1.    State Court Proceedings

Petitioner raised this issue on direct appeal from his resentencing proceedings.  The Florida Supreme Court denied the claim, holding as follows:

> Booker next argues that the prosecutor used a peremptory challenge as a discriminatory pretext. The analytical framework for addressing this issue is set forth in *Melbourne v. State*, 679 So.2d 759 (Fla.1996), wherein we stated the following, in pertinent part:
>
>> A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
>>
>> At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness. Throughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination.
>
> *Id*. at 764 (footnotes omitted). Regarding step 3, we provided a nonexclusive list of factors a trial court may consider in determining whether the reason given for exercising a peremptory challenge is genuine, including "the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment." *Id*. at 764 n. 8 (citing *State v. Slappy*, 522 So.2d 18 (Fla.1988), receded from on other grounds, *Melbourne v. State*, 679

---

[9]Petitioner does not cite *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), or any other federal law in his habeas petition in support of this ground.

So.2d 759, 765 (Fla.1996)). Finally, we stated that peremptory challenges are "presumed to be exercised in a nondiscriminatory manner" and that "the trial court's decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous." *Id*. at 764-65. It is under this analytical framework that the peremptory challenge issue here must be determined.

During voir dire, the State simultaneously exercised its second, third, and fourth peremptory challenges on three women: Collette Smith, Rae Leggett, and Phyllis Filer. Citing *State v. Neil*, 457 So.2d 481 (Fla.1984), defense counsel immediately objected to the State's peremptory challenge of Filer, a black woman.FN11 In response to the *Neil* objection, the prosecutor stated: "Your Honor, you'll find a pattern here that I'm looking for, and that is that I do not wish to have people that I believe will be unduly influenced by their love of the arts or their feeling for the arts, their literature." The prosecutor stated that he struck Leggett "when she finally said I love to read everything, I love the arts," and he struck Smith "when she finally said I love to read everything, I love the arts." He struck Filer, a librarian, because he thought that "on the unique facts of this case a librarian is going to be unduly-may subject herself to being unduly influenced by the fact we have a person who is going to bring in, I think he's bringing in six defense witnesses who are either publishers of or editors of major academic or professional journals in the field of English literature and poetry." The prosecutor further noted that he did not seek to challenge venireperson Erica Prince, who was African-American.

> FN11. When making the *Neil* objection, defense counsel did not immediately identify on the record that Ms. Filer was black. Counsel did so, however, shortly after returning from a lunch recess, and at that time, the trial judge noted, "Ms. Filer was of a distinct-distinctly identifiable racial or ethnic group, and she was black American, and the Court concurs."

Countering the prosecutor's arguments, defense counsel expressed that being an avid reader was not a race-neutral reason to exercise a peremptory challenge here because another venireperson, William Pepper, a white male, also was an avid reader and an editor but had not been excused by the State. In response, the prosecutor stated the following, in pertinent part:

No one there deals with the kinds of publications that are going to be dealt with by this person. I agree that Pepper, who, frankly, is somebody that the state has looked very closely at, Pepper has other reasons that we want to keep him, and frankly, I think they won't want to, such as his military service and history, his experience in writing letters on issues [ FN12] that I think were identified him as a potentially straight juror state juror. The issue is whether or not it's race neutral, is would I keep any librarian who deals with six different excuse me. In a case which they're going to bring in editors and writers from six different nationally recognized journals, journals that they are going to use as the basis for their presentation, the high standing those journals have in the academic world, would I keep any librarian under those circumstances? No.

FN12. Earlier during voir dire, Mr. Pepper indicated that he had been "published in newspapers and magazines" on various subjects, most recently "on the gasoline prices and the fact that they're higher in Alachua County."

After hearing the arguments of counsel, the trial judge found the State's reason for peremptorily challenging Ms. Filer to be race-neutral. The judge further stated: "The only inconsistency is the application-the issue of application of that reason across the board. I don't find that there's any pattern here of using the peremptory challenge against Ms. Filer as establishing any kind of a pattern of excusing only jurors of her particular ethnic background," and the judge allowed the State to strike Filer. Defense counsel objected to the ruling, but the court overruled the objection.

Before this Court, Booker concedes that the State presented a race-neutral reason for peremptorily challenging Ms. Filer. Instead, Booker argues that the State's proffered reason for peremptorily challenging Ms. Filer applied equally to Mr. Pepper, and, therefore, the trial court clearly erred in finding the State's reason to be genuine. Indeed, the decisions Booker relies upon would support his argument if it were true that the State's reason for challenging Ms. Filer applied equally to Mr. Pepper. For example, in *Daniel v. State*, 697 So.2d 959, 960-61 (Fla. 2d DCA 1997), the Second District determined that the State's reason for exercising a peremptory challenge on a Hispanic juror was a discriminatory pretext where the proffered reason for the

challenge applied equally to an unchallenged, non-Hispanic prospective juror. *See also Brown v. State*, 733 So.2d 1128, 1129-30 (Fla. 4th DCA 1999); *Foster v. State*, 732 So.2d 22, 24 (Fla. 4th DCA 1999); *Randall v. State*, 718 So.2d 230, 232 (Fla. 3d DCA 1998); *Overstreet v. State*, 712 So.2d 1174, 1177 (Fla. 3d DCA 1998); *Stroud v. State*, 656 So.2d 195, 196-97 (Fla. 2d DCA 1995); *Richardson v. State*, 575 So.2d 294, 295 (Fla. 4th DCA 1991). However, after carefully reviewing the record in the present case, we determine that the State's proffered reason for peremptorily challenging Ms. Filer was not equally applicable to Mr. Pepper, and, therefore, the trial court did not clearly err in finding the State's reason to be genuine.

During voir dire, Ms. Filer indicated that she had been a librarian for twenty-two years, with a bachelor's degree in sociology and a master's degree in library science. She indicated that she loved books but had "[n]ot really" been a writer. She stated that she read a "whole wide range" of literature, everything from "romance, to mysteries, to westerns, to non-fiction, the whole gamut." Pepper indicated that he once had been executive editor of the Gainesville Sun, and, for the first fifteen years of his professional life, worked for three newspapers in Texas, Louisiana, and Florida. Thereafter, he was a retail executive for fifteen years and ran an executive search firm for another fifteen years before retiring. He spent twenty years in the Naval Reserve and enjoyed reading history books and the Bible.

Based on their responses during voir dire, it is clear that Ms. Filer and Mr. Pepper, while similar in some ways, were sufficiently dissimilar for the State's proffered reason for challenging Ms. Filer to be inapplicable to Mr. Pepper. Specifically, the record shows that the State's proffered reason for peremptorily challenging Ms. Filer was that she was a librarian who loved the arts. Mr. Pepper was not a librarian, and while both he and Ms. Filer certainly were well-read, their interests in literature-and the arts in general-were dissimilar. This distinction is relevant here because many of the witnesses called by Booker, a poet, to support his case in mitigation were more grounded in poetry and literature than they were in newspapers and the like.FN13 Indeed, the State correctly points out that Ms. Filer had much more in common with Ms. Leggett FN14 and Ms. Smith, both of whom were peremptorily challenged at the same time as Ms. Filer, than she did with Mr. Pepper. Coupled with the fact that the State did not exercise a peremptory challenge on another black prospective juror, Ms. Prince, we find that the trial court did not clearly err in determining that the State's proffered

reason for striking Ms. Filer was genuine. *See generally Smith v. State*, 699 So.2d 629, 637 (Fla.1997) (recognizing that because a trial court's determination regarding genuineness "turns primarily on an assessment of credibility," such determination will not be overturned unless clearly erroneous).

> FN13. As set forth in footnote 8, supra, the defense presented six witnesses with ties to academia to testify, in primary part, about Booker's accomplishments in poetry.

> FN14. In fact, Ms. Leggett compared herself to Ms. Filer during voir dire, stating that "the library [is] one of my favorite places, so I read a little bit of everything."

*Booker I*, 773 So.2d at 1088-90.

2.    Clearly Established Supreme Court Law

When the government's choice of jurors is tainted with racial bias, that "overt wrong casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial . . . ." *Powers v. Ohio,* 499 U.S. 400, 412, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). So, "[f]or more than a century, this Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El v. Dretke*, 545 U.S. 231, 238, 125 S. Ct. 2317, 2323 - 2324, 162 L. Ed. 2d 196 (2005) (quoting *Georgia v. McCollum,* 505 U.S. 42, 44, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992)); *see Strauder v. West Virginia,* 100 U.S. 303, 308, 310, 25 L. Ed. 664 (1880); *Norris v. Alabama,* 294 U.S. 587, 596, 55 S. Ct. 579, 79 L. Ed. 1074 (1935); *Powers,* 499 U.S. at 404, 111 S. Ct. 1364.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Court established the test to be used in determining whether either party engaged in race-based exclusions of potential jurors through peremptory challenges. Race based exclusions are unconstitutional regardless of whether the defendant and the excluded juror(s) share the same race. *See Powers,* 499 U.S. at 402. The *Batson* test involves a three-step inquiry:

First, the defendant must make out a prima facie case "by showing that

the totality of the relevant facts gives rise to an inference of discriminatory purpose." 476 U.S., at 93-94, 106 S. Ct. 1712 (citing *Washington v. Davis,* 426 U.S. 229, 239-242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)) (footnote omitted). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U.S., at 94, 106 S. Ct. 1712; *see also Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem,* 514 U.S. 765, 767, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (*per curiam*).

*Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, 162 L. Ed. 2d 129 (2005).

Under AEDPA, in order to grant relief on a *Baston* claim a federal habeas court must find the state court conclusion was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, a federal habeas court can grant habeas relief only if it was unreasonable to credit the prosecutor's race-neutral explanations for the juror challenge. State court factual findings are presumed correct, which means the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." § 2254(e)(1). *See Miller-El v. Dretke,* 545 U.S. at 240; *Rice v. Collins*, 546 U.S. 333, 338-339, 126 S. Ct. 969, 974, 163 L. Ed. 2d 824 (2006). In *McNair v. Campbell*, 416 F.3d 1291, 1310 (11th Cir. 2005), the Eleventh Circuit explained:

If both sides carry their burdens, it is left to the court to determine whether the defendant has proven purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S. Ct. at 1724. At this point, "the decisive question will be whether counsel's race-neutral explanation ... should be believed." *Hernandez v. New York,* 500 U.S. 352, 365, 111 S. Ct. 1859, 1869, 114 L. Ed. 2d 395 (1991) (plurality opinion). This is "a pure issue of fact, subject to review under a deferential standard ... [and] peculiarly within a trial judge's province." *Id.* at 364-65, 111 S. Ct. at 1869 (internal quotation omitted).

3.      Federal Review of Claim

The record reflects that Mr. William Pepper and Ms. Phillis Filer were

questioned as part of the same prospective jury panel. Ms. Filer was first questioned by Mr. Smith, and she testified that she is a librarian and a lover of books, but she is not a writer. T. Vol. IX at 1290-91. She described her background as follows: "I've lived–first of all, I'm divorced. I have two children, daughters, and one granddaughter. I have lived in Gainesville for 23 years. I have worked at my job for the last 22 years. I'm originally from Ocala, long distance." *Id*. at 1304. Her undergraduate degree is in sociology from the University of Florida with a minor in education, and her master's degree in library science is from Florida State University. *Id*. at 1304-05. Her youngest daughter is studying journalism at Florida A & M, and her oldest is studying graphic design at Florida State University. *Id*. at 1304.

When examined by defense attorney Kearns, Ms. Filer testified that she subscribed to Black Enterprise, Jet, Ebony, and the Gainesville Sun. She reads everything else at the library *Id*. at 1368. When asked what type of literature she particularly likes, Ms. Filer answered, "[a] whole wide range of it. Because of my job, I need to know about all the different areas in order to give readers advisory, so that people will know what books are good. . . . And I just read everything from romance, to mysteries, to westerns, to non-fiction, the whole gamut." *Id*. at 1368-69.

Mr. Pepper responded when the panel was asked by Mr. Smith if any of them had been published. *Id*. at 1291. He stated that he had been published in newspapers and magazines and that he had always written. When asked about the subjects of his writings, he answered, "[a]ll kind of things. I wrote a letter to the editor most recently on the gasoline prices and the fact that they're higher in Alachua County" and on "Lombardi's misuse of a word that was misunderstood, and I've written magazine articles, so forth." *Id*. He stated that he had written all of his life and was once the executive editor of the Gainesville Sun.

Mr. Pepper described his background as follows:

[Pepper]: Well, I have lived in Gainesville four different periods of my life, Mr. Smith, and we returned here recently three years ago in

retirement.   My education I'm most proud of is I'm a graduate of Gainesville High School.  But I went on to graduate from the University of Florida and from the Columbia Graduate School of Journalism, New York.

The first 15 years of my active life, I was in the newspaper business on three newspapers; in Texas, Louisiana, and Florida.  The second 15-year period, I was a retail executive, vice-president of 550 stores throughout 33 states.

[Smith]: Which store was that?

[Pepper]: Gibson Discount Centers.  There used to be one on U.S. 441, north of Ocala.  And the last 15 years, I ran an executive search firm out of Dallas.  I established and ran that for 15 years and then retired.  My family consists of my wife of 46 years; we have three grown children and two grandchildren.

[Smith]: Your son–your children, sons or daughters?

[Pepper]: My son is a chemical engineer in Beaumont, Texas.

[Smith]: Texas.

[Pepper]: Texas.  My–one of my daughters is a housewife in Dallas and the other is a housewife in Forth Worth.

*Id*. at 1302-03.

On examination by Mr. Kearns, Mr. Pepper stated that he subscribes to the Gainesville Sun, Writer's Digest, National Geographic, and U.S. News and World Report.  *Id*. at 1369.  He continued:

My field of reading that I really enjoy is history and the Bible.  And I guess my favorite authors, other than those in the New Testament, writers would be Sir Winston Churchill.  And I'm currently involved in

reading Will Durant's History of Civilization. And I can't think of any other particular writings or writers that–I've read many, many, many, many writers.

*Id*. at 1369. When asked about his hobbies, Mr. Pepper stated that he's "[l]earning Spanish at the current time, and, also, I'm engaged in, really, that novel that we always want to write, a culmination of a lifetime of work." *Id*. at 1370. When asked about military service, Mr. Pepper stated that he spent 20 years in the Naval Reserve as a lieutenant commander. *Id*. at 1349. He did not participate in any court martials or military intelligence. Mr. Pepper stated for about 13 years of active duty he was occasionally called in for various assignments lasting anywhere from two to 13 weeks at a time. *Id*. at 1350.

When the State exercised its peremptory strike against Ms. Filer, the defense raised a *Neil*[10] challenge. Mr. Smith responded as follows:

> Your Honor, you'll find a pattern here that I'm looking for, and that is that I do not wish to have people that I believe will be unduly influenced by their love of the arts or their feeling for the arts, their literature. Leggett, in fact, I struck her when she finally said I love to read everything, I love the arts. I used Smith. Her last thing was I like traveling, I like the arts. I believe that we have a librarian. I believe a librarian is going to be on the unique–frankly, I think she's a very good juror. I think on the unique facts of this case, a librarian is going to be unduly–may subject herself to being unduly influenced by the fact we have a person who is going to bring in, I think he's bringing in six defense witnesses who are either publishers of or editors of major academic or professional journals in the field of English literature and poetry. Your Honor, I have some real concern there.

T. Vol. IX at 1382. Mr. Smith also noted that he had not challenged Erica Prince, who is African-American. *Id*. Defense counsel Kearns responded that the State had not given a race-neutral reason for seeking to exclude Ms. Filer and noted that Mr. Pepper

---

[10] *State v. Neil*, 457 So.2d 481 (Fla. 1984). In Florida's law governing racial challenges of the State's use of peremtory strikes, the initial threshold in challenging a strike is less than that in *Batson*, one need only show that the challenged juror is of a protected class. Thereafter, Florida law comports with the remaining two prongs of *Batson*. *See Melbourne v. State*, 679 So.2d 759, 764 (Fla. 1996).

was also an avid reader as well as having been an editor. *Id*. at 1384. Mr. Smith responded to the defense's argument as follows:

> Your Honor, in response, no one there deals with the kinds of publications that are going to be dealt with by this person. I agree that Pepper, who, frankly, is somebody that the State has looked very closely at, Pepper has other reasons that we want to keep him, and frankly, I think they won't want to, such as his military service and history, his experience in writing letters on issues that I think were–identified him as a potentially strong straight juror–State juror. The issue is whether or not it's race neutral, is would I keep any librarian who deals with six different–excuse me. In a case in which they're going to bring in editors and writers from six different nationally recognized journals, journals that they are going to use as the basis for their presentation, the high standing those journals have in the academic world, would I keep any librarian under those circumstances? No. If there–if it were not–if there was a racial issue here, then one would think that I would be trying to strike the other African-American who's also in this panel, Ms. Prince, which I simply am not, who the State intends to keep.

*Id*. at 1384-85. The trial court granted the State's strike, ruling that the State's articulated reason for challenging Ms. Filer was race-neutral and finding no pattern of excusing only jurors of her ethnic background. *Id*. at 1386.

Petitioner has not made a prima facie showing sufficient to support a *Batson* challenge. The "totality of relevant facts" does not give rise to an inference that the prosecution used its peremptory strike on Ms. Filer for discriminatory reasons. *See Batson*, 476 U.S. at 93-94. Mr. Smith stated that he challenged Ms. Filer because she is a librarian with a wide range of reading interests, and she might be unduly influenced by the "literary" witnesses which were going to be introduced by the defense in mitigation. This reason is race-neutral. Once a race-neutral explanation is given, it is left to the trial court to determine whether this explanation is believable-
-"a pure issue of fact, subject to review under a deferential standard ... [and] peculiarly within a trial judge's province." *Hernandez v. New York,* 500 U.S. at 364-65. A federal court can grant habeas relief only if it was unreasonable to credit the

prosecutor's race-neutral explanations for the juror challenge.

Given the record in this case, the trial court's determination that the prosecution's reason was race-neutral is not unreasonable. The state court distinguished Ms. Filer and Mr. Pepper, noting "while both he and Ms. Filer certainly were well-read, their interests in literature-and the arts in general-were dissimilar. This distinction is relevant here because many of the witnesses called by Booker, a poet, to support his case in mitigation were more grounded in poetry and literature than they were in newspapers and the like." *Booker I*, 773 So.2d at 1090. The record demonstrates that Mr. Pepper's literary interests were more limited than Ms. Filer's, and his employment history and experience were quite different from Ms. Filer's. Additionally, the state court noted the greater similarity between Ms. Filer and Rae Leggett, whom the State also challenged by peremptory strike. A review of the record supports this distinction. The following exchange occurred between Ms. Leggett and Mr. Kearns when he asked about her interests:

[Leggett]: I have a wide variety of interests. I like outdoors, basically, backpacking, camping. I like gardening, music. I love to read. I also like the arts. I like ballet, live plays, and art shows.

[Kearns]: What type of reading? You said you had a wide background on this one, so I may have opened up a bad door here.

[Leggett]: A little bit of everything. Kind of like her, I enjoy–the library's one of my favorite places, so I read a little bit of everything.

[Kearns]: Okay.

[Leggett]: Magazines, Coffee Journal, Powder Wig, which is a literary magazine, and Downbeat. I like music.

[Kearns]: Have a favorite writer?

**[Leggett]: Oh, that's hard to pin down. I like a little–it depends. I like Leona Hurst, I like some James Mitchener, Barbara Taylor Bradford, Stuart Woods. I'm trying to think. The last book I read was Tony Morrison's Paradise.**

*Id.* at 1372-73.[11]

The Court has stated, "[a]lthough the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices.'" *Rice v. Collins*, 546 U.S. at 338 *(*quoting *Purkett v. Elem,* 514 U.S. at 767-768). Because there is support in the record for the trial court's finding that the prosecution expressed a race-neutral reason for Ms. Filer's challenge and because Petitioner has not demonstrated by clear and convincing evidence that this finding is incorrect, no habeas relief is warranted.

Furthermore, the State did not seek to use a peremptory strike to challenge Ms. Prince, who was also African-American. While this fact alone is not dispositive, it tends to cast the State's reason for its peremptory challenge on Ms. Filer in a

---

[11] Collette Smith was also peremptorily challenged by the State. She was questioned on this topic by Mr. Kearns as follows:

[Smith]: I like cooking, woodworking, canning, not jars, but the seeds, sewing, traveling, the arts.

[Kearns]: Any magazines or newspapers that you subscribe to regularly?

[Smith]: Traditional Homes, National Geographic, The Traveler–and the Traveler.

[Kearns]: How about newspapers?

[Smith]: Gainesville Sun.

[Kearns]: Any favorite writer within the Gainesville Sun?

[Smith]: No.

T. Vol. IX at 1375.

plausible light. *See U.S. v. Allison*, 908 F.2d 1531, 1537 (11th Cir. 1990)("the unchallenged presence of three blacks on the jury undercuts any inference of impermissible discrimination that might arise simply by the striking of other blacks. We recognize that the seating of some blacks on the jury does not necessarily bar a finding of racial discrimination, but it is a significant fact."); *U.S. v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995)("This claim is meritless. Puentes's jury contained four African-Americans. Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."). Finally, Petitioner has not shown that similarly situated whites were not the subject of peremptory strikes for the same articulated reasons. In fact, Respondents have pointed to Ms. Leggett and Ms. Smith as similarly situated whites who were subjected to peremptory strikes for the same reason given for excluding Ms. Filer.

Petitioner has failed to establish that Ms. Filer was removed from the jury by peremptory challenge based solely on her race. The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground V:    Cruel and Unusual Punishment to Spend 30 Years on Death Row

Petitioner has been on death row since he was first sentenced in October of 1978. He contends that to execute him after this lengthy delay is cruel and unusual

punishment in violation of the Eighth Amendment.  Doc. 1 at 83-88.

## 1.    State Court Proceedings

Petitioner raised this claim in the direct appeal of his resentencing proceedings.[12]  The Florida Supreme Court denied the claim, holding as follows:

> The sixth and final issue presented by Booker is centered on an argument that to execute him after he has already spent over two decades on death row would constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States. Relatedly, Booker also claims that the State has forfeited its right to execute him under binding norms of international law.FN21 We recently rejected identical claims in *Knight v. State*, 746 So.2d 423, 437 (Fla.1998), cert. denied, 528 U.S. 990, 120 S. Ct. 459, 145 L. Ed.2d 370 (1999), in which we stated:
>
> > FN21. In support of this international law claim, Booker cites the International Covenant on Civil and Political Rights, as well as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.
> >
> > Although Knight makes an interesting argument, we find it lacks merit. As the State points out, no federal or state courts have accepted Knight's argument that a prolonged stay on death row constitutes cruel and unusual

---

[12]Petitioner also raised this issue in his motion for postconviction relief, and the postconviction court summarily denied the claim.  The Florida Supreme Court affirmed, 969 So.2d at 200, holding as follows:

> We conclude that the trial court properly denied this claim without an evidentiary hearing. Booker has already asserted on direct appeal that "to execute him after he has already spent over two decades on death row would constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States." *Booker*, 773 So.2d at 1096. In rejecting this claim, we noted that no federal or state court has accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay. *See id.* Additionally, in *Lucas v. State*, 841 So.2d 380 (Fla.2003), this Court affirmed the trial court's summary denial of a claim that the defendant's extended stay on death row constituted cruel and unusual punishment. *See id.* at 389 ("Despite his length of stay, under this Court's clear precedent, the trial court did not err in refusing to grant him an evidentiary hearing on his claim of cruel and unusual punishment.").

punishment, especially where both parties bear responsibility for the long delay. *See, e.g., White v. Johnson*, 79 F.3d 432 (5th Cir.1996); *State v. Smith*, 280 Mont. 158, 931 P.2d 1272 (Mont.1996). We also note that the Arizona Supreme Court recently rejected this precise claim. *See State v. Schackart*, 190 Ariz. 238, 947 P.2d 315, 336 (Ariz.1997) (finding "no evidence that Arizona has set up a scheme prolonging incarceration in order to torture inmates prior to their execution"), cert. denied, 525 U.S. 862, 119 S. Ct. 149, 142 L. Ed.2d 122 (1998).... We similarly reject Knight's claim under international law.

*See also Elledge v. State*, 706 So.2d 1340, 1342 n. 4, 1347 n. 10 (Fla.1997) (rejecting defendant's claim that death sentence could not be carried out due to alleged unconstitutional delay), cert. denied, 525 U.S. 944, 119 S. Ct. 366, 142 L. Ed.2d 303 (1998); *State v. Moore*, 256 Neb. 553, 591 N.W.2d 86, 94-95 (rejecting capital defendant's claim that it would violate the Eighth Amendment to execute him after his lengthy stay on death row), cert. denied, 528 U.S. 990, 120 S. Ct. 459, 145 L. Ed.2d 370 (1999). Consistent with our decision in *Knight*, we reject Booker's claims regarding this issue.

*Booker I*, 773 So.2d at 1096.

2.      **Clearly Established Supreme Court Law**

There is no Supreme Court case holding that a prolonged stay on death row violates the Eighth Amendment guarantee against cruel and unusual punishment. The Eleventh Circuit recently held that given the absence of Supreme Court precedent on this issue, the execution of a petitioner following a thirty-one year term of imprisonment is not in itself a constitutional violation. *See Thompson v. Sec'y for Dep't. of Corr.*, 517 F.3d 1279 (11th Cir. 2008)(finding claim unexhausted and without merit), cert. denied, 129 S. Ct. 1299 (2009).

3.      **Federal Review of Claim**

a.      **Eighth Amendment Violation**

Claims like the one Petitioner is making here are termed "*Lackey*" claims, *i.e.*,

*Lackey v. Texas*, 514 U.S. 1045, 115 S. Ct. 1421 (Mem), 131 L. Ed.2d 304 (1995)(denying petition for writ of certiorari where petitioner claimed that a seventeen-year confinement on death row violated his Eighth Amendment rights), and these claims are grounded in the constitutional principles that constrain the death penalty. The argument is that while the death penalty can be justified by "retribution and deterrence of capital crimes by prospective offenders," an execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S. Ct. 2909, 2929-30, 49 L. Ed.2d 859 (1976) (plurality opinion). Justice White, concurring in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed.2d 346 (1972), opined that:

> At the moment that [a proposed execution] ceases realistically to further these purposes [of deterrence and the coherent expression of moral outrage], however, the emerging question is whether its imposition in such circumstances would violate the Eighth Amendment. It is my view that it would, for its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.

*Furman*, 408 U.S. at 312 (White, J., concurring). In Justice Stevens memorandum respecting the denial of certiorari in *Lackey*, he noted that "[t]hough the importance and novelty of the question presented by this certiorari petition are sufficient to warrant review by this Court, those factors also provide a principled basis for postponing consideration of the issue until after it has been addressed by other courts." *Lackey*, 514 U.S. at 1045.

The federal courts which have considered *Lackey* claims have denied them. *See e.g., Thompson v. Sec'y for Dep't. of Corr., supra*; *Allen v. Ornoski*, 435 F.3d 946, 959 (9th Cir.2006), cert. denied, 546 U.S. 1136, 126 S. Ct. 1140, 163 L. Ed.2d 944 (2006)(barring claim as successive, but concluding claim would not be successful on the merits where the petitioner had been on death row for twenty-three years);

*Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir.1998) (holding claim procedurally barred, but noting that death row delays do not constitute cruel and unusual punishment because delay is a function of the "desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life."); *White v. Johnson*, 79 F.3d 432, 439 (5th Cir.1996) ("The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards .... White has benefitted from this careful and meticulous process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights."); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir.  1995)("We conclude that Appellant has failed to show that executing him after fifteen years on death row, during which time he faced at least seven execution dates, would constitute cruel and unusual punishment.").

  *See also Knight v. Florida*, 528 U.S. 990, 120 S. Ct. 459, 145 L. Ed.2d 370 (1999) (denying certiorari where petitioner had been on death row nearly twenty-five years)(Thomas, J., concurring). ("I write only to point out that I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed."); *Johnson v. Bredesen*, 130 S. Ct. 541, 544 (2009)(denying application for stay of execution for inmate on death row for nearly twenty-nine years)(Thomas, J., concurring)("It has been 14 years since JUSTICE STEVENS proposed this "novel" Eighth Amendment argument. [citing *Lackey*]. I was unaware of any constitutional support for the argument then. And I am unaware of any support for it now." (internal citation omitted)).

  The Florida Supreme Court rejected this claim based in part on the fact that no

federal or state courts have accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay.  Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law.  Because Petitioner cannot establish a federal constitutional violation on this basis, this ground is denied.

> b.    International Law Violation

Petitioner also contends that the State of Florida has forfeited its right to execute him under binding norms of international law, referencing the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.[13] Doc. 1 at 88.

The ICCPR guarantees a broad spectrum of civil and political rights to individuals within signatory nations. *United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir.2002). It is not, however, binding on federal courts:

> [T]he ICCPR does not create judicially-enforceable individual rights. Treaties affect United States law only if they are self-executing or otherwise given effect by congressional legislation. Articles 1 through 27 of the ICCPR are not self-executing. Nor has Congress passed implementing legislation. Therefore, the ICCPR is not binding on federal courts.

*Id*. at 1283 (internal citations omitted).

Petitioner also refers to The United Nations Convention Against Torture and

---

[13] Petitioner has failed to cite any applicable portions of either of these laws in his habeas petition.

Other Cruel, Inhuman, or Degrading Treatment or Punishment (the "Convention") which is implemented in the United States by 8 C.F.R. § 208.18. While Petitioner fails to cite any relevant provision of the Convention that he believes entitles him to relief, the regulations provide that "[t]orture is an extreme form of cruel and inhumane treatment," 8 C.F.R. § 208.18(a)(2); however, torture "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty. . . ." 8 C.F.R. § 208.18(a)(3). Accordingly, the Convention provides Petitioner no relief from his death sentence.

Petitioner has failed to demonstrate that the state court's rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Because Petitioner cannot establish a federal constitutional violation on this basis, this ground is denied.

## V. CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2254 11(b).

The court finds no substantial showing of the denial of a constitutional right in this case. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation

Case No.: 1:08cv143/RS

omitted).  Therefore, no certificate of appealability is issued herewith.  If either party objects to this denial, that party may file a motion for reconsideration of the denial; however, a motion to reconsider such denial does not extend the time to appeal.  § 2254 11(a).

## VI. CONCLUSION

For the foregoing reasons, the petition for issuance of a writ of habeas corpus (doc. 1) is DENIED.  Additionally, no certificate of appealability will issue.

ORDERED on October 5, 2010.


/s/ Richard Smoak
RICHARD SMOAK
United States District Judge